The CHAIR KING, INC., Chair King, S.A., Inc., Jerome Kosoy, M.D., M.E. Ford and Associates, Beautique, Inc., Discovery Services of Texas, Inc., Vantage Shoe Warehouse, Inc., Counselor Systems, Inc., Pope and Booth, P.C., Jeffrey K. Musker, D.C., and Pope Escrow Company, Appellants

v.

GTE MOBILNET OF HOUSTON, INC. and Chick–Fil–A, Inc., Appellees.

No. 14–00–00711–CV.

Court of Appeals of Texas, Houston (14th Dist.).

May 6, 2004.

Julius Glickman, Thomas C. Wright and Chad M. Forbes, Houston, TX, for appellants.

Anne Cohl Gravelle, Kimberly Marie Phillips, Steve M. Zager, Douglas D. Turek, Houston, Jill Warren, Austin, TX, for appellees.

Panel consists of Justices YATES, HUDSON, and FROST.

## OPINION

KEM THOMPSON FROST, Justice.

We overrule the motions for rehearing filed by appellants and by appellee GTE Mobilnet of Houston, Inc. We withdraw the opinion issued in this case on January 29, 2004, and we issue the following opinion in its place.

This is a complicated case [1] in which we address several interesting and multi-faceted issues under the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"). Appellants, plaintiffs below, challenge the trial court's judgment dismissing their private damage claims under the TCPA and

---

1. In their appellate briefs, all parties assert that "this case is not complicated." The clerk's record in this summary-judgment appeal contains more than 14,700 pages. Taken together, the parties' appendices exceed 740 pages. In over 230 pages of appellate briefing, the parties have addressed more than a dozen legal issues, including one of apparent national first impression.

their common-law claims and granting appellees/defendants' no-evidence and traditional motions for summary judgment. We conclude that the trial court correctly granted summary judgment as to appellants' common-law claims, all of their claims against appellee Chick–Fil–A, Inc. ("Chick–Fil–A"), and the TCPA claims of appellants The Chair King, Inc., Chair King, S.A., Inc., M.E. Ford and Associates, Vantage Shoe Warehouse, Inc., Counselor Systems, Inc., Pope and Booth, P.C., and Pope Escrow Company. However, we reverse the trial court's judgment as to the TCPA claims of appellants Jerome Kosoy, M.D., Beautique, Inc., Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C. against appellee GTE Mobilnet of Houston, Inc. ("GTE Mobilnet") and remand these claims for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellants The Chair King, Inc., Chair King, S.A., Inc., Jerome Kosoy, M.D., M.E. Ford and Associates, Beautique, Inc., Discovery Services of Texas, Inc., Vantage Shoe Warehouse, Inc., Counselor Systems, Inc., Pope and Booth, P.C., Jeffrey K. Musker, D.C., and Pope Escrow Company (collectively referred to herein as the "Recipients") allege they are individuals or entities engaged in commercial, professional, or personal matters in and around various major metropolitan areas of Texas, including Houston, Dallas, San Antonio, and Austin. The Recipients assert that, from as early as 1992, they have received numerous unsolicited fax advertisements on their fax machines.

Some of the fax communications in question were disseminated by AdverFax, a now defunct company that was formerly in the business of sending out fax adver-

tisements for other businesses.[2] AdverFax targeted recipients whom it perceived would be likely to buy its clients' products or services and then sent advertisements or coupons via fax to these targets. To facilitate its operations, AdverFax divided Houston into zones, each of which contained facsimile numbers for that geographic area. AdverFax maintained a database containing fax numbers, sorted according to zone, which enabled AdverFax's customers to send faxed advertisements to all of the fax numbers in any chosen geographic zone. With its customers' authorization, AdverFax sent fax advertisements to the numbers in its database pertaining to the requested zones. The summary-judgment evidence shows that Adverfax sent out large numbers of faxed advertisements for its customers' products and services.

In 1995, the Recipients filed suit against GTE Mobilnet in the United States District Court for the Sourthern District of Texas (the "Federal Suit"). Although the Recipients named several defendants (including GTE Mobilnet) in that suit, Chick–Fil–A was not among them. The United States Court of Appeals for the Fifth Circuit ultimately determined that the federal court lacked subject-matter jurisdiction. *See Chair King, Inc. v. Houston Cellular Corp.*, 131 F.3d 507, 509 (5th Cir.1997). The Federal Suit was then dismissed.

The Recipients filed this case in Harris County District Court in 1995. On March 11, 1998, the Recipients added GTE Mobilnet and Chick–Fil–A (collectively referred to herein as the "Advertisers") to this case, suing Chick–Fil–A for the first time. The Recipients alleged that numerous fax-advertising companies (including AdverFax) as well as the Advertisers and many other businesses who also retained these fax-advertising companies had sent unsolicited

---

**2.** After the Recipients filed suit against Adver- Fax, AdverFax ceased its operations.

fax advertisements to the Recipients.[3] The Recipients asserted the following claims: (1) a private damage claim under the TCPA; (2) negligence; (3) negligence per se; (4) invasion of privacy; (5) trespass to chattels; and (6) gross negligence. The Recipients also alleged that the defendant advertisers had engaged in a conspiracy with their respective fax-advertising companies to send unsolicited fax advertisements.

The defendants filed a joint motion for summary judgment asserting the following grounds:

(1) The damages claims under the TCPA are barred because, at the time the faxes in question were sent, Texas had not authorized the filing of private damage claims under the TCPA in Texas courts;[4]

(2) The TCPA does not apply to any faxes sent solely within Texas;

(3) If the TCPA does apply to intrastate faxes, then Congress lacked the power to enact the TCPA under the Commerce Clause of the United States Constitution;

(4) The TCPA's minimum damages provision violates due process under the United States and Texas Constitutions because it is grossly disproportionate to any damage suffered by the Recipients;

(5) The TCPA violates the defendants' free-speech rights under the United States and Texas Constitutions;

(6) The TCPA violates the Equal Protection Clause of the United States Constitution because it unfairly discriminates against fax advertisements based on the content of their protected speech;

(7) The receipt of unsolicited fax advertisements does not constitute an invasion of privacy;

(8) The Recipients do not possess any right to privacy;

(9) Receipt of unsolicited fax advertisements does not constitute a trespass to chattels;

(10) The conduct about which the Recipients complain, as a matter of law, does not constitute negligence, gross negligence or negligence per se; and

(11) Because all of the Recipients' underlying claims fail, as a matter of law, their conspiracy claims also fail.

After the trial court denied this joint motion, GTE Mobilnet filed a separate motion for summary judgment and a supplemental motion asserting the following grounds:

(1) GTE Mobilnet allegedly did not send the faxes in question to the Recipients; rather they were sent by independently owned and operated agents;

(2) Jerome Kosoy, M.D. is a GTE Mobilnet customer so his consent to receive fax advertising from GTE Mobilnet is allegedly implied;

(3) The Recipients' claims are barred by the statute of limitations;

(4) There is no evidence GTE Mobilnet sent unsolicited fax advertisements to any of the Recipients; and

---

**3.** The Recipients brought their claims seeking class-action certification for both a plaintiffs' class and a defendants' class. The trial court did not rule on the class-certification issue, and that issue is not before this court.

**4.** The Texas Legislature did enact such a statute, and it took effect on September 1, 1999.

*See* Act of May 26, 1999, 76th Leg., R.S., ch. 635, §§ 1–3, 1999 Tex. Gen Laws 3203 (codified at Tex. Bus. & Comm.Code § 35.47(c)–(g)). However, this statute does not apply to communications made before September 1, 1999. *See id.* at §§ 2, 3.

(5) There is no evidence to support the essential elements of the Recipients' common-law claims.

Chick–Fil–A also filed an individual motion for summary judgment and asserted the following grounds:

(1) The two-year statute of limitations under section 16.003 of the Texas Civil Practice and Remedies Code bars all of the Recipients' claims;

(2) Chick–Fil–A did not use its fax machines to send faxes to the Recipients and there was no agency relationship between Chick–Fil–A and the fax-advertising companies that sent faxes to the Recipients;

(3) There is no evidence to support the essential elements of the Recipients' common-law claims; and

(4) Chick–Fil–A is not liable for the actions of its independent franchisees.

The Recipients filed responses to both the joint motion for summary judgment and the individual motions, and they also filed their own motion for a partial summary judgment relating to certain aspects of their TCPA claims against certain defendants, including the Advertisers.

After granting summary-judgment motions dismissing the Recipients' claims against certain defendants, the trial court reconsidered its ruling on the joint motion for summary judgment, granted the joint motion, and also granted the individual motions for summary judgment of the remaining defendants, including the Advertisers. The trial court also denied the Recipients' motion for partial summary judgment. Both in the trial court and on appeal, the Recipients settled with various defendants, so that only GTE Mobilnet and Chick–Fil–A remain as defendants/appellees in this case.

On appeal, the Recipients assert the trial court erred by granting the joint motion for summary judgment and the individual motions of GTE Mobilnet and Chick–Fil–A as well as by denying the Recipients' motion for partial summary judgment.

## II. STANDARDS OF REVIEW

In reviewing a traditional motion for summary judgment, we take as true all evidence favorable to the non-movant, and we make all reasonable inferences in the non-movant's favor. *Dolcefino v. Randolph*, 19 S.W.3d 906, 916 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). If the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the non-movant to raise a genuine, material fact issue sufficient to defeat summary judgment. *Id.*

In reviewing a no-evidence motion for summary judgment, we ascertain whether the non-movant produced any evidence of probative force to raise a genuine issue of fact as to the essential elements attacked in the no-evidence motion. *Id.* We take as true all evidence favorable to the non-movant, and we make all reasonable inferences therefrom in the non-movant's favor. *Id.* A no-evidence motion for summary judgment must be granted if the party opposing the motion does not respond with competent summary-judgment evidence that raises a genuine issue of material fact. *Id.* at 917. Because the trial court did not specify the grounds for its ruling, we will affirm if any of the grounds advanced in the motion has merit. *See Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989).

We review the trial court's interpretation of applicable statutes *de novo*. *Johnson v. City of Fort Worth*, 774 S.W.2d 653, 655–56 (Tex.1989). In construing federal statutes, we look first at the language of the entire statute to determine if the language in question has a plain and unambiguous meaning regarding the issue before us. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450, 122 S.Ct. 941, 950,

151 L.Ed.2d 908 (2002). The inquiry stops if the statutory language is unambiguous and "the statutory scheme is coherent and consistent." *Id.* (quotations omitted). If the relevant statutory language is ambiguous and if no agency responsible for implementing the statute has interpreted the language, then we seek guidance in the statutory structure, relevant legislative history, and congressional purposes in enacting the TCPA.[5] *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 737, 105 S.Ct. 1598, 1603, 84 L.Ed.2d 643 (1985); *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). We read the words of a statute in their context, taking note of their place in the overall statutory scheme. *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133, 120 S.Ct. 1291, 1301, 146 L.Ed.2d 121 (2000) (citations and quotations omitted). In doing so, we must interpret the statute as a "symmetrical and coherent regulatory scheme" and, if possible, fit all parts into a "harmonious whole." *Id.* We must construe the language of the TCPA, if possible, so that no word is rendered meaningless or insignificant. *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 449, 151 L.Ed.2d 339 (2001).

### III. ANALYSIS

**A. Are the Recipients' TCPA damage claims barred because, at the time the faxes in question were sent, Texas had not authorized the filing of damage actions under the TCPA in Texas courts?**

One of the Advertisers' grounds for summary judgment was that the Recipients' private damage claims under the TCPA are barred because the TCPA requires a state to authorize damage actions under the TCPA before these claims may be asserted. As noted above, Texas did not specifically authorize the filing of these private damage claims in its courts until September 1, 1999, and the statute containing this authorization does not apply to the fax advertisements in question because they were sent before September 1, 1999. *See* Act of May 26, 1999, 76th Leg., R.S., ch. 635, §§ 1–3, 1999 Tex. Gen. Laws 3203 (codified at Tex. Bus. & Comm.Code § 35.47(c)-(g)). To frame our statutory analysis relating to this legal issue and the other TCPA issues before the court, we begin with an examination of the relevant language and the possible interpretations of this federal statute.

**1. The Statutory Language and the Possible Interpretations**

The first summary-judgment ground we must consider turns on the interpretation of the following statutory language, upon which the Recipients base their TCPA damage claim:

> **Private right of action.** A person or entity may, *if otherwise permitted by the laws or rules of court of a State,* bring in an appropriate court of that State—
>
> (A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,
>
> (B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

---

**5.** If an agency responsible for implementing the TCPA has interpreted the statutory language at issue, then the reviewing court gives deference to that agency's reasonable interpretation of the relevant language. *See United States v. Mead Corp.,* 533 U.S. 218, 227–28, 121 S.Ct. 2164, 2171–72, 150 L.Ed.2d 292 (2001). As explained below, we find that the Federal Communications Commission has not interpreted the language at issue in this case, so this aspect of the standard of review does not apply to this case.

(C) both such actions.

. . .

47 U.S.C. § 227(b)(3) (emphasis added).

In addition to providing this private right of action under section 227(b)(3), the TCPA also authorizes any state attorney general to bring civil actions on behalf of its state's residents to obtain an injunction against such unsolicited fax advertisements and to recover the same monetary damages that may be recovered under section 227(b)(3). *See* 47 U.S.C. §§ 227(b)(3) & (f)(1). The TCPA provides that federal district courts have exclusive jurisdiction over actions brought by state attorneys general. 47 U.S.C. § 227(f)(2). Finally, the TCPA also authorizes the Federal Communications Commission ("FCC") to intervene as of right in any state attorney general's action. *See* 47 U.S.C. § 227(f)(3).

Federal courts of appeals uniformly have determined that private TCPA damage claims may be brought only in state courts. *See Murphey v. Lanier*, 204 F.3d 911, 913–15 (9th Cir.2000) (agreeing with five other circuit courts of appeals that federal courts have no jurisdiction over private damage claims under the TCPA). The critical language in section 227(b)(3) is "if otherwise permitted by the laws or rules of court of a State." At least three different interpretations of this language have developed regarding the circumstances under which a claimant may bring a TCPA damage claim in state court. *See* Robert R. Biggerstaff, *State Courts and*

*the Telephone Consumer Protection Act of 1991: Must States Opt In? Can States Opt Out?* 33 Conn. L.Rev. 407, 412–13 (2001). These three interpretations, which we refer to as "opt-in," "opt-out," and "acknowledgment," each produce different results when applied to the Recipients' TCPA claims.

### The "Opt–In" Interpretation

Under the "opt-in" interpretation espoused by the Advertisers, private TCPA damage claims cannot be brought in a state's courts until that state's legislature enacts legislation or that state's highest court promulgates court rules that specifically permit these claims to be filed in that state's courts. *See Autoflex Leasing, Inc. v. Mfrs. Auto Leasing*, 16 S.W.3d 815, 817 (Tex.App.—Fort Worth 2000, pet. denied) (holding that, under plain meaning of 47 U.S.C. § 227(b)(3), TCPA damage claims cannot be asserted in a state's court until these claims are expressly permitted by state legislation or state court rule and that such claims may not be brought in Texas unless the alleged violation occurred on or after September 1, 1999, when a statute took effect authorizing these claims). This view has been adopted by the only Texas court to address the issue. However, courts from nine other states have rejected the opt-in interpretation[6]. *See Lary v. Flasch Bus. Consulting*, No. 2020803, —— So.2d ——, ——, 2003 WL 22463948, at *2–*5 (Ala.Civ.App. Oct.31, 2003) (holding that a state's legislative or

---

**6.** In support of their argument in this regard, the Advertisers also have cited an unpublished ruling by a United States District Court that state legislation authorizing TCPA damage claims is required before claimants in that state may file suit. *See Nicholson v. Hooters of Augusta, Inc.*, 136 F.3d 1287, 1288 (11th Cir.1998) (describing district court "opt-in" ruling), *modified in part by* 140 F.3d 898 (11th Cir.1998). However, this ruling was vacated by the United States Court of

Appeals for the Eleventh Circuit, which held that federal courts have no subject-matter jurisdiction over private damage claims under the TCPA. *See id.* at 1290. The Advertisers also cite dicta in *Murphey v. Lanier*, in which the Ninth Circuit, in the course of finding no federal jurisdiction over private damage claims under the TCPA, states that these claims can be litigated in state court only if the state consents. *See* 204 F.3d 911, 914 (9th Cir.2000).

judicial authorities need not "opt in" for the state's courts to entertain private damage claims under the TCPA); *Condon v. Office Depot, Inc.*, 855 So.2d 644, 645–48 (Fla.Dist.Ct.App.2003) (same); *Kaufman v. ACS Sys., Inc.*, 110 Cal.App.4th 886, 2 Cal.Rptr.3d 296, 306–12 (2003) (holding TCPA provides for private damage claims in state court unless prohibited by the state); *Reynolds v. Diamond Foods & Poultry, Inc.*, 79 S.W.3d 907, 908–10 (Mo. 2002) (holding state enabling legislation is not required to assert private damage claims under the TCPA); *Zelma v. Market U.S.A.*, 343 N.J.Super. 356, 778 A.2d 591, 593–98 (2001) (holding no affirmative act by legislature or highest state court was necessary for trial court to entertain private damage claims under the TCPA); *Worsham v. Nationwide Ins. Co.*, 138 Md. App. 487, 772 A.2d 868, 871–74 (2001) (stating, in context of damage action under 47 U.S.C. § 227(c)(5), which has same "if otherwise permitted" language, that state courts have jurisdiction over private TCPA claims in the absence of a state statute declining to exercise jurisdiction over TCPA claims); *Aronson v. Fax.com, Inc.*, 51 Pa. D. & C. 4th 421, 423–36 (Ct.Com.Pl. 2001) (adopting "opt-out" rather than "opt-in" construction of 47 U.S.C. § 227(b)(3)); *Hooters of Augusta, Inc. v. Nicholson*, 245 Ga.App. 363, 537 S.E.2d 468, 470–71 (2000) (same as *Aronson*); *Schulman v. Chase Manhattan Bank*, 268 A.D.2d 174, 710 N.Y.S.2d 368, 370–72 (N.Y.App.Div.2000); *see also International Science & Tech. Inst. v. Inacom Communications, Inc.*, 106 F.3d 1146, 1156–58 (4th Cir.1997) (same as *Aronson* in context of finding no subject-matter jurisdiction in federal court). If states do not need to affirmatively enact a statute or promulgate a court rule allowing private TCPA damage actions for claimants to file suit in state court, there are at least two other possible interpretations.

### The "Opt–Out" Interpretation

Under a second interpretation, states may have the ability to "opt out" by passing a statute declining to entertain TCPA damage actions in that state's courts. *See International Science & Tech. Inst.*, 106 F.3d at 1156–58; *Hooters of Augusta, Inc.*, 537 S.E.2d at 470–71. This interpretation points to the concern about a potential flood of private TCPA actions in state courts, burdening state courts with exclusive state-court jurisdiction over a federal damage claim that may have had no previous counterpart under state law. *See International Science & Tech. Inst.*, 106 F.3d at 1158 (stating that "[i]n creating a conditional right of action to enforce the TCPA in state courts, Congress neither exceeded its delegated powers nor invaded the province of state sovereignty, which still may be exercised to prohibit the action ... Congress enacted the TCPA to assist states where they lacked jurisdiction ... and it recognized state power to reject Congress' [sic] authorization").

### The "Acknowledgment" Interpretation

Under a third interpretation, states may not "opt out" because the Supremacy Clause of the United States Constitution requires them to provide a judicial forum for prosecution of private TCPA damage claims. Under this interpretation, the language of the TCPA simply acknowledges the states' rights to structure their court systems and apply neutral state-court procedural rules. *See Schulman*, 710 N.Y.S.2d at 372 (concluding that "the phrase 'if otherwise permitted by the laws or rules of court of a State' merely acknowledges the principle that states have the right to structure their own court systems and that state courts are not obliged to change their procedural rules to accommodate TCPA claims"); Biggerstaff, *supra*, at 416–46. To date, it does not ap-

pear that any state has enacted a statute that explicitly refuses to allow private TCPA damage claims in that state's courts. *See* Biggerstaff, *supra*, at 416. The only court to date whose holding directly contradicts the acknowledgment interpretation is *R.A. Ponte Architects, Ltd. v. Investors' Alert, Inc. See* 149 Md.App. 219, 815 A.2d 816, 827 (2003) (holding that Maryland had "opted out" of TCPA damage claims by enacting in 1989—two years before the enactment of the TCPA—a state statute regarding unsolicited fax advertisements without allowing for private damage claims), *cert. granted,* 374 Md. 358, 822 A.2d 1224 (2003); *contra Condon,* 855 So.2d at 648 (holding Florida did not "opt out" of TCPA by, prior to enactment of TCPA, passing statutes regulating unsolicited fax advertisements without allowing for private damage claims); *and Hooters of Augusta, Inc.,* 537 S.E.2d at 471–72 (same as *Condon* for Georgia).

After scrutinizing the wording of the TCPA, we conclude that the relevant language of this statute does not have a plain and unambiguous meaning regarding the issues in this case. *See Barnhart,* 534 U.S. at 450, 122 S.Ct. at 950; *Condon,* 855 So.2d at 647 (stating that the "if otherwise permitted" language is ambiguous); Biggerstaff, *supra,* at 446 (stating that "significant ambiguity" exists in the statute); *but see Autoflex Leasing,* 16 S.W.3d at 817. Having found the relevant statutory language to be ambiguous, we now seek guidance in the relevant legislative history and consider the congressional purposes in enacting the TCPA. *See Florida Power & Light Co.,* 470 U.S. at 737, 105 S.Ct. at 1603.

### 2. Legislative History of the TCPA

From 1989 to 1991, Congress considered various bills addressing the telemarketing practices made possible by technological innovations, including the transmission of advertisements by fax, i.e., sending the advertisement in electronic form along a telephone line so that it is printed on paper at the receiving end. In the process, Congress held three hearings and produced three committee reports. The final bill combined features of three previous bills. *Kaufman,* 2 Cal.Rptr.3d at 306–12.

In drafting the bills, Congress became aware of several problems associated with unsolicited fax advertisements. *See Telemarketing Practices: Hearing on H.R. No. 628, H.R. No. 2131, and H.R. No. 2184 Before the Subcomm. on Telecomms. and Fin. of the House Comm. on Energy and Commerce,* 101st Cong., 1st Sess., at 54–57 (1989) (hereinafter *"Telemarketing Practices"*); H.R.Rep. No. 102–317, 1st Sess., at 25 (1991). "Since businesses [had] begun to express concern about the interference, interruptions and expenses that junk fax[es] . . . placed upon them, states [were] taking action to eliminate these telemarketing practices. [Two states had] enacted laws banning the use of facsimile machines for unsolicited advertising. Similar bills [were] . . . pending in the legislatures of about half the states." H.R.Rep. No. 102–317, 1st Sess., at 25 (1991).

"[State laws] had limited effect, however, because States do not have jurisdiction over interstate calls. Many States . . . expressed a desire for Federal legislation to regulate interstate telemarketing calls to supplement their restrictions on intrastate calls." Sen. Rep. No. 102–178, 1st Sess., at 3 (1991), *reprinted in* 1991 U.S.C.C.A.N., at 1970. "[B]usiness owners [were] virtually unanimous in their view that they [did] not want their fax lines tied up by advertisers trying to send messages." *Telemarketing Practices, supra,* at 54–55 (footnotes omitted). "Extensive research . . . revealed no case of a compa-

ny (other than those advertising via fax) which oppose[d] legislation restricting advertising via fax." *Id.* at 54 n. 35. As a state legislator from Utah put it, " 'You get a message you didn't want from people you don't know on paper they didn't buy.' " *Id.* at 54 (statement of Rep. Ken Jacobsen).

Richard Kessel, a New York state official, spearheaded the movement to ban unsolicited fax advertisements in his state after he was unable to fax a document to the governor's office which, at the time, was processing an incoming advertisement. *See Telemarketing Practices, supra,* at 55. "The last thing you want when you're trying to meet a deadline, or trying to get a memo to your boss ... is to be disturbed by someone trying to sell draperies or submarine sandwiches." *Id.* In hearings held in 1991, the co-founder of the Center for the Study of Commercialism, Michael Jacobson, described the "numerous nuisance faxes" he had received and complained that they "not only use the recipient's paper, but also prevent faxes from being sent out and prevent legitimate faxes from coming in." Hearing on Sen. No. 1462, Sen. No. 1410, and Sen. No. 857 *Before the Subcomm. on Communications of the Sen. Comm. on Commerce, Science, and Transp.,* 102d Cong., 1st Sess., 41 (1991) (statement of Michael Jacobson).

The legislative counsel for the American Civil Liberties Union, Janlori Goldman, told the House subcommittee, "we ... support the ... limits on fax machines, in terms of sending unsolicited advertising. We think that because of the burden that is placed on the individual who has to pay for the cost of the communication, that that then justifies [a] broader ban [than that placed on telephone solicitations]." *Telemarketing/Privacy Issues: Hearing on H.R. No. 1304 and H.R. No. 1305 Before the Subcomm. on Telecomms. and Fin. of the House Comm. on Energy and Commerce,* 102d Cong., 1st Sess., at 47. The subcommittee was well aware that a "festering problem [had] arisen from the so-called 'junk fax.' Junk fax is more than merely irritating. It represents an unfair shifting of the cost of advertising from the advertiser to the unwitting customer.... [U]nsolicited and unwanted faxes can tie up a machine for hours and thwart the receipt of legitimate and important messages." *Id.* at 3–4.

Congress recognized that, although considered "[a]n office oddity during the mid 1980s, the facsimile machine has become a primary tool for business to relay instantaneously written communications and transactions." H.R.Rep. No. 102–317, 1st Sess., 10 (1991). By 1991, millions of offices in the United States were sending more than thirty billion pages of information by fax each year in an effort to speed communications and cut overnight delivery costs. *Id.* But "the proliferation of fax machines has been accompanied by explosive growth in unsolicited facsimile advertising, or 'junk fax.' " *Id.* at 10. "Facsimile machines are designed to accept, process, and print all messages ... The fax advertiser takes advantage of this basic design by sending advertisements to available fax numbers, knowing that [they] will be received and printed by the recipient's machine. This type of telemarketing is problematic for two reasons. First, it shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax." H.R.Rep. No. 102–317, *supra,* at 10. "[W]hen a facsimile machine is receiving a fax, it may require several minutes or more to process and print the advertisement." *Id.* at 25. "Only the most sophisticated and expensive facsimile machines

can process and print more than one message at a time." *Id.*

"When an advertiser sends marketing material to a potential customer through regular mail, the recipient pays nothing to receive the letter." *Id.* But the recipient of fax advertisements "assumes both the cost associated with the use of the facsimile machine and the cost of the expensive paper used to print out facsimile messages." *Id.* "[T]hese costs are borne by the recipient[s] of the fax advertisement regardless of their interest in the product or service being advertised." *Id.; see also* Sen. Rep. No. 102–178, 1st Sess., at 2 (1991), *reprinted in* 1991 U.S.C.C.A.N., at 1969.

Senator Ernest Hollings of South Carolina, the sponsor of the TCPA, in urging its passage, made the following statements regarding the civil damage provisions of the TCPA:

> The ... [Act] contains a private right-of-action provision that will make it easier for consumers to recover damages from receiving these computerized calls. The provision would allow consumers to bring an action in State court against any entity that violates the [Act]. The [Act] does not, because of constitutional constraints, dictate to the States which court in each State shall be the proper venue for such an action, as this is a matter for State legislators to determine. Nevertheless, it is my hope that States will make it as easy as possible for consumers to bring such actions, preferably in small claims court.... Small claims court or a similar court would allow the consumer to appear before the court without an attorney. The amount of damages in this legislation is set to be fair to both the consumer and the telemarketer. However, it would defeat the purposes of the [Act] if the attorneys' costs to consumers of bring-

ing an action were greater than the potential damages. I thus expect that the States will act reasonably in permitting their citizens to go to court to enforce this [Act].

137 Cong. Rec. S16205–16206 (daily ed. Nov. 7, 1991) (statement of Sen. Hollings).

Congress enacted the TCPA in November of 1991. The measure was signed into law on December 20, 1991. Section 227(b) of the Act makes it "unlawful for any person within the United States ... to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C). The TCPA defines "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. § 227(a)(4).

### 3. The Advertisers' Arguments for the "Opt In" Interpretation

The Advertisers assert that Texas can permit private TCPA damage claims in its courts only by enacting legislation that specifically authorizes these claims. In support of this assertion, the Advertisers argue that the following substantiates the opt-in interpretation: (1) the *Autoflex Leasing, Inc.* case; (2) Senator Hollings's remarks; (3) dictionary definitions; (4) other instances of the use of the phrase "otherwise permitted" in the United States Code; (5) Congress's ability to enact a clearer statute if it intended either the opt-out interpretation or the acknowledgment interpretation; and (6) the legislative history of the 1999 amendment to section 35.47 of the Texas Business and Commerce Code.

The Advertisers rely heavily on the *Autoflex Leasing, Inc.* case in which the Fort

Worth Court of Appeals held that the "if otherwise permitted" language unambiguously requires a state to pass legislation or promulgate court rules allowing private TCPA damage actions before claimants may bring these claims in a state's courts. *See Autoflex Leasing, Inc.*, 16 S.W.3d at 817. After careful consideration of the language of the TCPA, the statutory structure, relevant legislative history, and the congressional purposes in enacting the TCPA, we respectfully disagree with the analysis of the *Autoflex Leasing, Inc.* court. *See Florida Power & Light Co.*, 470 U.S. at 737, 105 S.Ct. at 1603; *Blum*, 465 U.S. at 896, 104 S.Ct. at 1548. Instead, we conclude that the relevant language of the TCPA is ambiguous. *See Condon*, 855 So.2d at 647 (stating that the "if otherwise permitted" language is ambiguous); Biggerstaff, *supra*, at 446 (stating that "significant ambiguity" exists in the statute); *but see Autoflex Leasing*, 16 S.W.3d at 817. Furthermore, we do not find the federal cases cited by the *Autoflex Leasing, Inc.* court persuasive in resolving this issue.

Reviewing Senator Hollings's comments as a whole and in context, they do not address the issue of whether the opt-in interpretation is correct. *Condon*, 855 So.2d at 647–48; *Zelma*, 778 A.2d at 596–97. Rather, Senator Hollings's comments show his concern about the bill's silence as to the proper state court in which claimants should bring TCPA damage claims and his hope that the states would make their small claims courts available for these claims so that a claimant might receive fast and efficient relief without having to retain a lawyer. *See Zelma*, 778 A.2d at 596–97; 137 Cong. Rec. S16205–16206 (daily ed. Nov. 7, 1991) (statement of Sen. Hollings).

Dictionary definitions do not clarify the ambiguity, but rather seem to confirm it.

For example, one dictionary defines "permit" as "1: to consent to expressly or formally: grant leave for or the privilege of: Allow, Tolerate ... 2: to give (a person) leave: Authorize ..." Webster's Third New International Dictionary 1683 (1993 ed.). This definition seems to favor the Advertisers' position; however, it gives "allow" as a synonym and defines "allow" in pertinent part as meaning: "4: Permit ... a: to permit by way of concession ... b: to permit by neglecting to restrain or prevent ..." *Id.* at 58. The definition of this synonym weighs against the opt-in interpretation. The dictionary definitions show that the ordinary meaning of the relevant part of the TCPA is uncertain and that the TCPA does not unambiguously require states to expressly authorize TCPA damage claims.

The Advertisers also point to various federal statutes that contain the words "otherwise permitted" or "permitted" as support for the opt-in interpretation. However, the Advertisers do not cite any cases interpreting these statutes, and we do not find that the text of these statutes alone is helpful in interpreting the TCPA in this case. *See Zelma*, 778 A.2d at 595–96 (finding comparison of TCPA language with the language of other federal statutes not to be helpful).

The Advertisers also assert that, if Congress intended to achieve the results contemplated by the opt-out or acknowledgment interpretations, it could have done so directly and clearly by using other language. While this assertion is hardly debatable, it is also true that Congress could have more directly and clearly expressed any intent it had to require prior state authorization before allowing TCPA damage actions in state court. Therefore, this argument is neither convincing nor helpful in resolving the issue.

The Advertisers also cite part of the legislative history for the 1999 changes to section 35.47 of the Texas Business and Commerce Code, which states that "each state must decide whether to permit its citizens to bring civil actions for violations of the [TCPA]." House Research Org., Bill Analysis, Tex. H.B. 23, 76th Leg., R.S. (1999). First, this legislative history is consistent with both the opt-in and the opt-out interpretations.[7] Second, courts construing statutory language should give little weight to statements made by legislators after the enactment of the statute. *In re Jane Doe*, 19 S.W.3d 346, 352 (Tex. 2000). Third, these statements regarding the TCPA were made eight years after its enactment by the research organization of the Texas House of Representatives, which was not involved in passage of the TCPA by the United States Congress. *See Sullivan v. Finkelstein*, 496 U.S. 617, 631, 110 S.Ct. 2658, 2667, 110 L.Ed.2d 563 (1990) (Scalia, J., concurring in part) (stating that "post-enactment legislative history" is an oxymoron and should not be considered in interpreting statutes and that even the proponents of its use limit it to statements from members of the same legislative body that enacted the statute). For these reasons, we do not find this Texas legislative history relevant or helpful in the interpretation of the TCPA. Similarly, the FCC memorandum opinion cited by the Recipients does not weigh strongly for or against the opt-in interpretation and does not constitute an interpretation by the FCC of the statutory language at issue in this case.

After scrutinizing the language of the TCPA and considering the object sought to be obtained, the circumstances of the TCPA's enactment, the legislative history, and the consequences of the different interpretations, we agree with the courts from the nine other states that have declined to adopt the opt-in interpretation. *See Lary*, —— So.2d at ——, ——, 2003 WL 22463948, at *2–*5; *Condon*, 855 So.2d at 645–48; *Kaufman*, 2 Cal.Rptr.3d at 306–12; *Reynolds*, 79 S.W.3d at 908–10; *Zelma*, 778 A.2d at 593–98; *Worsham*, 772 A.2d at 871–74; *Aronson*, 51 Pa. D. & C. 4th at 423–36; *Hooters of Augusta, Inc.*, 537 S.E.2d at 470–71; *Schulman*, 710 N.Y.S.2d at 370–72.

Congress sought to penalize and discourage unsolicited fax advertisements because they are an unwelcome source of annoyance, disruption, and expense to consumers. *See Telemarketing Practices, supra*, at 54–57; H.R.Rep. No. 102–317, 1st Sess., at 25 (1991). Congress intended to help states regulate and penalize unsolicited fax advertisements by overcoming the states' inability to regulate interstate faxes. *See* Sen. Rep. No. 102–178, 1st Sess., at 3 (1991), *reprinted in* 1991 U.S.C.C.A.N., at 1970. By definition, this meant that no state statute allowed claimants to assert a damage claim based on unsolicited interstate faxes when the TCPA took effect. If we were to adopt the opt-in interpretation, that would mean that no private damage actions for unsolicited interstate faxes could be asserted in any state unless and until that state enacted an enabling statute. There is no apparent reason why Congress would structure TCPA damage actions in such an inefficient and ineffective manner. *See Aronson*, 51 Pa. D. & C. 4th at 429 (stating that there would be no reason why Congress would have created a statutory scheme in

---

7. We note that at least one commentator has asserted that the Texas Legislature enacted the 1999 amendments to section 35.47 of the Texas Business and Commerce Code because Texas consumers had complained to the legislature that there was uncertainty about whether TCPA damage actions could be brought in Texas courts, rather than because it was considered necessary. *See* Biggerstaff, *supra*, at 409 n. 10.

which it looked exclusively to the state courts to enforce private damage actions and in which, at the same time, Congress prevented states from entertaining these actions until each state passed an enabling statute, even though state courts otherwise would have been able to hear these federal claims). We reject the opt-in interpretation.

### 4. "Opt–Out" Versus "Acknowledgment" Interpretations

The acknowledgment interpretation, which would construe the TCPA to provide an unconditional private damage claim under federal law that must be asserted in state court and cannot be declined, creates a troubling incongruity. As shown below, the acknowledgment interpretation is inconsistent with the text of the TCPA, because it would make language in the TCPA doubly redundant.

■■■ The supporters of the acknowledgment interpretation argue that the "if otherwise permitted" clause simply acknowledges that states have the right to structure their own court systems and are not required to change their neutral procedural rules to accommodate TCPA damage claims. *See Schulman,* 710 N.Y.S.2d at 370–72; Biggerstaff, *supra,* at 416–46. As courts of general jurisdiction, it is presumed that Texas district courts have the power to adjudicate private damage claims under federal statutes, unless the Texas Legislature or the United States Congress provide that they do not.[8] *See* U.S.

Const., art. VI, cl. 2; Tex. Const. art. V, § 8; Tex. Gov't Code §§ 24.007, 24.008; *Dubai Petroleum Co. v. Kazi,* 12 S.W.3d 71, 75 (Tex.2000). These principles are well-established under this country's federal system of government and under the Supremacy Clause of the United States Constitution. *See Howlett v. Rose,* 496 U.S. 356, 367–71, 110 S.Ct. 2430, 2438–41, 110 L.Ed.2d 332 (1990); *Dubai Petroleum Co.,* 12 S.W.3d at 75. There is no requirement that anything be stated in the federal statute for these principles to apply; as long as Congress duly enacts a statute that it has the power to enact under the United States Constitution, these principles are triggered and state courts of general jurisdiction must entertain these claims unless the federal statute says otherwise or unless neutral state procedural rules that are not preempted prevent the assertion of a claim. *See Howlett,* 496 U.S. at 367–71, 110 S.Ct. at 2438–41. Therefore, Congress had no need to state these principles in the TCPA.

Further, the procedural matters mentioned by proponents of the acknowledgment interpretation are generally procedural law or rules relating to matters such as subject-matter jurisdiction, amount in controversy, or venue—all of which simply allow the state, by its neutral procedural rules, to decide which state court will hear the federal claim. *See* Biggerstaff, *supra,* at 418. While Congress might have wanted to include a provision in the statute that would confirm this reality, that confirmation is already accomplished by other lan-

---

8. Statutes duly enacted by the United States Congress are as much laws in Texas as statutes enacted by the Texas Legislature. *See Howlett v. Rose,* 496 U.S. 356, 367–69, 110 S.Ct. 2430, 2438–39, 110 L.Ed.2d 332 (1990). Texas law and federal law form one system of jurisprudence, which together constitutes the law of the land for Texas. *See Howlett,* 496 U.S. at 367–69, 110 S.Ct. at 2438–39. Under

the Supremacy Clause of the United States Constitution, the United States Constitution and duly-enacted federal statutes are "the supreme Law of the Land," and Texas courts have a responsibility to enforce that law according to their ordinary procedural rules. *See* U.S. Const., art. VI, cl. 2; *Howlett,* 496 U.S. at 367–69, 110 S.Ct. at 2438–39.

guage in the TCPA—"[a] person or entity may, if otherwise permitted by the laws or rules of court of a State, bring *in an appropriate court of that State* ..." 47 U.S.C. § 227(b)(3) (emphasis added). This italicized language unmistakably recognizes the constitutional realities that would apply anyway. It would be redundant and risk rendering the words meaningless to interpret the "if otherwise provided" clause to have the same meaning. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 449, 151 L.Ed.2d 339 (2001) (stating that courts should construe the language of federal statutes, if possible, so that no word is rendered meaningless or insignificant).

 Given the language of the TCPA, the statute's purposes, the provision allowing state attorneys general to obtain the same remedies for their citizens that are available in the private damage actions, and Congress's reasonable and legitimate concern that it not overburden state court systems with potentially large numbers of private claims, we agree with the majority view that the opt-out interpretation is the correct one. Enabling legislation is not required, but a state may prohibit private TCPA damage actions in its courts. *See International Science & Tech. Inst.*, 106 F.3d at 1156–58; (explaining purposes of TCPA and why opt-out interpretation makes sense from a policy perspective); *Lary*, —— So.2d ——, —— & n. 2, 2003 WL 22463948, at *2–*5 & n. 2 (adopting opt-out interpretation and disapproving of acknowledgment interpretation); *Condon*, 855 So.2d at 645–48 (adopting opt-out interpretation); *Kaufman*, 2 Cal.Rptr.3d at

312 (holding that states can opt out of TCPA damage actions and that California has not done so); *Reynolds*, 79 S.W.3d at 910 (adopting opt-out interpretation); *Worsham*, 772 A.2d at 874; *Aronson*, 51 Pa. D. & C. 4th at 430 (adopting opt-out interpretation); *Hooters of Augusta, Inc.*, 537 S.E.2d at 471 (adopting opt-out interpretation); *but see Schulman*, 710 N.Y.S.2d at 372 (adopting acknowledgment interpretation); *Autoflex Leasing*, 16 S.W.3d at 817 (adopting opt-in interpretation).

One commentator who strongly supports the acknowledgment interpretation claims that it is preferable because courts should not construe a statute to alter a delicate constitutional balance without an explicit directive from Congress that this was intended. Biggerstaff, *supra*, at 426–33. The argument is that the opt-out interpretation upsets the fragile balance of this country's federal system of government and threatens to undermine the Supremacy Clause. *See id.* But the federal system of government in our country is strong, and the opt-out interpretation gives effect to what its proponents conclude is the statutory directive from Congress under the Supremacy Clause. Rather than undermining the authority of federal law, this interpretation recognizes it as the supreme law of the land. If Congress decides that it is not satisfied with the results of its opt-out system for private TCPA damage claims in state courts, our federal lawmakers are free to make these claims mandatory in all state courts by amending the TCPA and preempting state statutes to the contrary.[9] For these

---

**9.** The same commentator suggests that if there are any constitutional problems relating to the acknowledgment interpretation arguably effecting a federal commandeering of state resources, these problems can be avoided by holding that federal courts and state

courts have concurrent jurisdiction over private TCPA damage claims. *See* Biggerstaff, *supra*, at 446. This option is not available to this court because the Fifth Circuit already has determined that no federal jurisdiction is available to the Recipients. *See Chair King*,

reasons, we respectfully decline to adopt the acknowledgment interpretation. Instead, we hold that the Recipients may assert TCPA damage claims as long as Texas has not prohibited them from doing so.

### 5. Section 35.47 of the Texas Business and Commerce Code

■ Before the enactment of the TCPA, Texas enacted a statute regulating certain unsolicited fax advertisements without providing for any private damage claim. *See* Act of May 23, 1989, 71st Leg., R.S., ch. 783, § 1, 1989 Tex. Gen Laws 3469, 3469–70. The effect, if any, of this prior statute on the ability of the Recipients to assert TCPA damage claims is not before us. In their primary argument on appeal, the Advertisers contend the trial court correctly granted summary judgment based on the opt-in interpretation. In the course of this argument, the Advertisers expressly reject the opt-out interpretation of the TCPA. However, in an alternative appellate argument, they assert that, as to faxes sent before September 1, 1999, Texas has opted out of the TCPA based on the 1989 unsolicited fax statute. *See* 1989 Tex. Gen Laws at 3469–70.

Although the Advertisers asserted in the trial court that there is no implied damage action under this statute, they did not assert as a summary-judgment ground any opt-out theory or any theory under which the 1989 unsolicited fax statute precludes

the Recipients from asserting their TCPA damage claims. Therefore, this court cannot affirm the trial court's summary judgment on any such grounds because the Advertisers did not assert them in the trial court. *See Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex.1993) (holding appellate court cannot affirm trial court's summary judgment on a ground not expressly stated in motion for summary judgment). We are limited to reviewing the ground that the Advertisers did assert—that the Recipients' claims are barred because Texas did not authorize the filing of TCPA damage claims in Texas courts until September 1, 1999.[10] Accordingly, we conclude that the trial court erred by granting summary judgment based on its implied ruling that the Recipients' TCPA damage claims are barred under the opt-in interpretation.

### B. Are the Recipients' TCPA damage claims barred because the TCPA does not apply to intrastate faxes?

■ The Recipients also assert that the trial court erred by impliedly granting summary judgment based on the Advertisers' argument that the TCPA applies only to interstate facsimile advertisements. The Recipients argue that the TCPA applies to intrastate faxes based on its plain language. The Recipients are correct.

The TCPA regulates unsolicited telephone calls and fax communications. *See*

*Inc.*, 131 F.3d at 514. In any event, finding federal jurisdiction in this regard would be contrary to the holding of every federal court of appeals that has addressed this issue and would not result in a correct ruling.

10. Even if the Advertisers had asserted this ground in the trial court, there would be no merit in it, because the 1989 unsolicited fax statute does not constitute an opting out of private damage claims under the TCPA, which was enacted in 1991. *See Condon,* 855

So.2d at 648 (holding Florida did not "opt out" of TCPA by, prior to enactment of TCPA, passing statutes regulating unsolicited fax advertisements without allowing for private damage claims); *Hooters of Augusta, Inc.*, 537 S.E.2d at 471–72 (same for Georgia); *but see R.A. Ponte Architects, Ltd.*, 815 A.2d at 827 (holding Maryland opted out of TCPA by, prior to enactment of TCPA, passing statutes regulating unsolicited fax advertisements without allowing for private damage claims).

47 U.S.C. § 227. The TCPA amended the Communications Act of 1934. *See* 47 U.S.C. § 151 *et seq.* Although the Communications Act contains an interstate only restriction, the TCPA itself contained a conforming amendment that expressly excepts the TCPA from the Communications Act's interstate-only restriction. *See* 47 U.S.C. § 152(b) (1994); *Texas v. Am. Blastfax, Inc.,* 121 F.Supp.2d 1085, 1088 (W.D.Tex.2000); *Omnibus Int'l, Inc. v. AT & T, Inc.,* 111 S.W.3d 818, 821–22 (Tex. App.—Dallas 2003, pet. granted, judgm't vacated w.r.m.); *Hooters of Augusta, Inc.,* 537 S.E.2d at 471–72 & n. 7. Under the TCPA, "[i]t shall be unlawful for any person within the United States . . . to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine." 47 U.S.C. § 227(b)(1)(C). The statute defines the term "unsolicited advertisement" as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." 47 U.S.C. § 227(a)(4).

Although the TCPA does not specifically state that it covers both interstate and intrastate faxes, section 227(b)(1)(C) applies to unsolicited faxes sent by any person in the United States, without limiting its scope to interstate faxes. *See* 47 U.S.C. § 227(b)(1)(C). Furthermore, in expressly excepting the TCPA from the interstate-only restriction of the Communications Act, the conforming amendment evinces a congressional intent that the TCPA apply to intrastate fax communications. *See Am. Blastfax, Inc.,* 121 F.Supp.2d at 1088; *Omnibus Int'l, Inc.,* 111 S.W.3d at 821–22; *Hooters of Augusta, Inc.,* 537 S.E.2d at 471 (holding Congress expressed its intent to regulate both interstate and intrastate communications by excepting the TCPA from interstate limita-

tion of 47 U.S.C. § 152). The statutory scheme of the TCPA is coherent and consistent, and the language relevant to this issue is unambiguous. *See Barnhart,* 534 U.S. at 450, 122 S.Ct. at 950. Therefore, we hold that the TCPA applies to both interstate and intrastate facsimile advertisements. *See Am. Blastfax, Inc.,* 121 F.Supp.2d at 1088; *Omnibus Int'l, Inc.,* 111 S.W.3d at 821–22; *Hooters of Augusta, Inc.,* 537 S.E.2d at 471. We find the trial court erred in granting summary judgment based on its implied ruling that the TCPA applies only to interstate faxes.

## C. Does the TCPA fall outside Congress's power under the Commerce Clause?

■ The trial court also granted summary judgment based on its implied ruling that, if the TCPA applies to intrastate faxes, Congress lacks the power to enact the TCPA under the Commerce Clause of the United States Constitution.

■ First, Congress has authority to regulate intrastate faxes. This is because telephones and telephone lines—even when used solely for intrastate purposes—are part of an aggregate interstate system and therefore are inherent instrumentalities of interstate commerce. *See United States v. Weathers,* 169 F.3d 336, 341 (6th Cir.1999) ("It is well established that telephones, even when used intrastate, constitute instrumentalities of interstate commerce") (emphasis omitted); *Am. Blastfax, Inc.,* 121 F.Supp.2d at 1087. Thus, Congress may regulate purely intrastate telephone activity to protect interstate commerce. *See United States v. Gilbert,* 181 F.3d 152, 158 (1st Cir.1999) (discussing the "long standing" line of cases holding Congress may regulate purely intrastate telephone activity under the Commerce Clause); *Pavlak v. Church,*

727 F.2d 1425, 1427 (9th Cir.1984) ("Federal jurisdiction over purely intrastate communications under the Federal Communications Act derives from Congress' plenary power to regulate interstate commerce through regulating the means of such commerce.... Since the telephone is an instrumentality of interstate commerce, Congress has plenary power under the Constitution to regulate its use and abuse") (citations and quotations omitted); *see also United States v. Lopez,* 514 U.S. 549, 558, 115 S.Ct. 1624, 1629, 131 L.Ed.2d 626 (1995) (stating "Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"). Congress has the requisite power to regulate intrastate faxes and was not acting beyond its powers in enacting the TCPA. Indeed, to hold otherwise would undermine well-established federal law in other areas. *See, e.g., Alley v. Miramon,* 614 F.2d 1372, 1379 (5th Cir.1980) (stating "[t]his court has consistently held that the intrastate use of the telephone may confer jurisdiction over a private action under Section 10(b) and Rule 10b–5 [of the federal securities laws]"). Accordingly, we find the trial court erred in granting summary judgment based on its implied ruling that the TCPA falls outside the power granted to Congress in the Commerce Clause of the United States Constitution. *See Am. Blastfax, Inc.,* 121 F.Supp.2d at 1087–88 (holding Commerce Clause challenge to TCPA failed).

**D. Does the TCPA's minimum damage provision violate due process under the United States and Texas Constitutions on the ground that it is grossly disproportionate to any damage suffered by the Recipients?**

The trial court also granted summary judgment based on its implied ruling

that the TCPA's minimum damage award of $500 per fax violates due process under the Due Process Clause of the Fifth Amendment to the United States Constitution and under the Due Course of Law Clause of the Texas Constitution. *See* U.S. Const. amend. V; Tex. Const. art. I, § 16. Given the Supremacy Clause of the United States Constitution, it is unusual to have a federal statute challenged on state constitutional grounds; however, the Advertisers assert that Congress voluntarily made the Texas Constitution applicable to the TCPA by means of the TCPA's "if otherwise permitted" language. *See* U.S. Const., art. VI, cl. 2. For the sake of argument, we presume the Advertisers are correct. When, as in this case, the Advertisers have not argued that differences in state and federal constitutional guarantees are material to the case, and none are apparent, we limit our analysis to the Fifth Amendment Due Process Clause and presume that its protections are congruent with those of the Texas Constitution's Due Course of Law Clause. *See Bentley v. Bunton,* 94 S.W.3d 561, 579 (Tex.2002).

The Advertisers contend that the $500 minimum amount of damages per TCPA violation that a claimant may recover in a private damage action violates constitutional due process because this minimum amount is "grossly disproportionate" to any actual harm suffered by the Recipients. *See* 47 U.S.C. § 227(b)(3). A statutory penalty violates due process "only where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, Iron Mt. & S. Ry. Co. v. Williams,* 251 U.S. 63, 67, 40 S.Ct. 71, 73, 64 L.Ed. 139 (1919).

The Advertisers assert that the actual cost of receiving an unsolicited fax is two

to forty cents per fax, yet the minimum damage amount is $500 per fax. But the TCPA damage provision was not designed solely to compensate each private injury caused by unsolicited fax advertisements. It also was intended to address and deter the overall public harm caused by such conduct. *See Am. Blastfax, Inc.*, 121 F.Supp.2d at 1090. The TCPA damage amount was meant (1) to take into account the difficult-to-quantify business-interruption costs imposed upon recipients of unsolicited fax advertisements; (2) to deter the unscrupulous practice of shifting these costs to unwitting recipients of unsolicited fax advertisements; and (3) to give an adequate incentive for an individual claimant to bring suit on his own behalf. *See id.; Kenro, Inc. v. Fax Daily, Inc.*, 962 F.Supp. 1162, 1166 (S.D.Ind.1997).

The Supreme Court has stated that statutory damages designed to address such "public wrongs" need not be "confined or proportioned to [actual] loss or damages; for, as it is imposed as a punishment for the violation of a public law, the Legislature may adjust its amount to the public wrong rather than the private injury, just as if it were going to the state." *Williams*, 251 U.S. at 66–67, 40 S.Ct. at 73. In *Williams*, the Supreme Court found that the statute at issue, a fixed penalty for passenger overcharges, did not violate due process. *See id.* In explaining its ruling, the Court stated: "[w]hen [the statute] is considered with due regard for the interests of the public, the numberless opportunities for committing the offense, and the need for securing uniform adherence to established passenger rates, we think it properly cannot be said to be so severe and oppressive as to be wholly disproportioned to the offense or obviously unreasonable." *Id.* The same is true here. *See Am. Blastfax, Inc.*, 121 F.Supp.2d at 1091.

Congress identified two legitimate public harms intended to be addressed by the TCPA's ban on unsolicited fax advertisements: (1) these fax advertisements can substantially interfere with a business or residence because fax machines generally can handle only one message at a time, to the exclusion of other messages; and (2) unsolicited fax advertisements unfairly shift nearly all of the advertiser's printing costs to the recipient of the advertisement. *See Kenro*, 962 F.Supp. at 1167. The TCPA's $500 minimum damages provision, when measured against the overall harms of unsolicited fax advertising and the public interest in deterring this unwelcome conduct, is not "so severe and oppressive as to be wholly disproportioned to the offense or obviously unreasonable." *See Am. Blastfax, Inc.*, 121 F.Supp.2d at 1091 (holding $500 minimum damage amount under TCPA does not violate due process); *Kenro*, 962 F.Supp. at 1166–67 (same); *ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc.*, 203 Ariz. 94, 50 P.3d 844, 850–52 (2002) (same); *Kaufman*, 2 Cal.Rptr.3d at 312 (same); *Harjoe v. Herz Fin.*, 108 S.W.3d 653, 654–55 (Mo. 2003) (same). Accordingly, we find the trial court erred in granting summary judgment based on its implied ruling that the TCPA minimum damage amount violates constitutional due process.

**E. Does the TCPA violate the Advertisers' free-speech rights under the United States and Texas Constitutions?**

■ The trial court also granted summary judgment based on its implied ruling that the TCPA violated the Advertisers' free-speech rights under the United States and Texas Constitutions. Because the Advertisers have not shown how the text, history, or purpose of the Texas state constitutional provision affords them any greater protection than the First Amend-

ment in the context of this case, even if the Texas Constitution applied to the TCPA, we still would apply the same analysis under the Texas Constitution and the First Amendment. *See Bentley*, 94 S.W.3d at 578.

■■■ The Advertisers contend the TCPA's ban on unsolicited fax advertisements is an impermissible regulation of commercial speech. *See* 47 U.S.C. § 227(a)(4) (defining "unsolicited advertisement" as "material advertising the commercial availability or quality" of goods and services). Because commercial speech occupies a "subordinate position in the scale of First Amendment values," a statute regulating commercial speech passes constitutional muster as long as it directly advances a substantial governmental interest in a manner that forms a "reasonable fit" with the interest. *See Board of Trustees of State Univ., N.Y. v. Fox*, 492 U.S. 469, 477–80, 109 S.Ct. 3028, 3033–35, 106 L.Ed.2d 388 (1989). The issue before this court is whether the TCPA's ban on unsolicited fax advertisements meets this standard.

A federal district court in Oregon was the first to address this issue. In *Destination Ventures, Ltd. v. F.C.C.*, 844 F.Supp. 632 (D.Or.1994), *aff'd* 46 F.3d 54 (9th Cir. 1995), that court found Congress's interest in preventing cost shifting " 'from the advertiser to the unwitting customer' " and in preventing fax machines from being tied up by unwanted messages was a substantial interest that is identified in the TCPA's legislative history. *See id.* at 637 (quoting TCPA House Report). We already have determined that these interests are sufficiently legitimate to justify the TCPA's $500 per-violation minimum damages provision. Furthermore, as the district court in *Destination Ventures* stated, "there were repeated, uncontradicted references made before Congress describing how facsimile advertising shifts economic burdens from the advertiser to the consumer ... Congress legitimately relied upon the testimony from authorities, as well as the contemporaneous state laws and media reports." *Id.* We find Congress's interests in passing the TCPA— preventing "unwitting customers" from bearing the brunt of advertising costs and preventing unwanted fax machine interference—are substantial and real. *See Am. Blastfax, Inc.*, 121 F.Supp.2d at 1091–92.

Inasmuch as Congress's interests in preventing the harms caused by unsolicited fax advertising are substantial and real, banning this advertising directly advances these interests. *See Destination Ventures*, 844 F.Supp. at 637 (stating that "[b]ecause Congress has addressed a substantial interest in protecting consumers from the economic harms inflicted through unsolicited advertisement faxes ... the subsequent banning of those unsolicited faxes directly advances that interest"). Thus, the only remaining inquiry is whether there is a "reasonable fit" between the TCPA's ban on unwanted fax advertisements and the interests directly advanced by the ban. *See Fox*, 492 U.S. at 480–81, 109 S.Ct. at 3034–35. The district courts in *Destination Ventures, Kenro*, and *Am. Blastfax, Inc.* considered and rejected as alternatives allowing recipients of unsolicited fax advertisements to place themselves on a "do not fax" list as well as placing time, length, and/or frequency limits on unsolicited fax advertising. *See Am. Blastfax, Inc.*, 121 F.Supp.2d at 1092; *Kenro*, 962 F.Supp. at 1168–69; *Destination Ventures*, 844 F.Supp. at 638–39. We conclude there is a reasonable fit, no more extensive than necessary, between the TCPA's ban on unsolicited fax advertisements and the interests directly advanced by the ban. *See Missouri v. Am. Blast Fax, Inc.*, 323 F.3d 649, 652–59 (8th Cir.

2003) (rejecting First Amendment challenge to TCPA ban on unsolicited fax advertisements); *Destination Ventures, Ltd. v. F.C.C.*, 46 F.3d 54, 56 (9th Cir.1995) (affirming district court holding that TCPA did not violate First Amendment); *Am. Blastfax, Inc.*, 121 F.Supp.2d at 1091–92; *Kaufman*, 2 Cal.Rptr.3d at 312–23; *Harjoe*, 108 S.W.3d at 654–55; *Kenro*, 962 F.Supp. at 1167–69 (holding the mere existence of "imaginable alternatives" to the TCPA does not show the statute is improperly tailored); *but see Rudgayzer & Gratt v. Enine, Inc.*, 193 Misc.2d 449, 749 N.Y.S.2d 855, 857–60 (Civ.Ct.2002) (adopting analysis of *Missouri ex. rel. Nixon v. Am. Blast Fax, Inc.*, 196 F.Supp.2d 920 (E.D.Mo.2002), *rev'd by Am. Blast Fax, Inc.*, 323 F.3d at 652–59, and holding that TCPA violates First Amendment).

▮▮▮▮▮ The Advertisers also argue the TCPA violates the First Amendment because it lacks a scienter requirement for the $500 minimum damages provision. Generally, only statutes imposing criminal liability for dissemination of unprotected speech must contain a scienter element. *See New York v. Ferber*, 458 U.S. 747, 765, 102 S.Ct. 3348, 3358, 73 L.Ed.2d 1113 (1982); *Smith v. California*, 361 U.S. 147, 150–55, 80 S.Ct. 215, 217–19, 4 L.Ed.2d 205 (1959). The TCPA imposes no criminal liability. The only case the Advertisers cite in support of their contention that non-criminal statutes regulating commercial speech must have a scienter requirement is an Eighth Circuit case, *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684 (8th Cir.1992). In that case, however, the court characterized the statute at issue, which prohibited the sale or rental of

violent videos to minors, as "quasi-criminal in nature." *Id.* at 690. The TCPA is not a quasi-criminal statute, and we decline to extend First Amendment jurisprudence by requiring all non-criminal commercial speech regulations to include a scienter requirement.[11] *See Am. Blastfax, Inc.*, 121 F.Supp.2d at 1092 & n. 10. Accordingly, we find the trial court erred in granting summary judgment based on its implied ruling that the TCPA violates the Advertisers' free-speech rights under the United States and Texas Constitutions.

## F. Does the TCPA violate the Equal Protection Clause of the United States Constitution?

▮▮▮▮ The trial court also granted summary judgment based on its implied ruling that the TCPA violates the Equal Protection Clause of the United States Constitution because the statute's ban on unsolicited fax advertisements unfairly discriminates between commercial advertisements and noncommercial solicitations. The Advertisers argued in the trial court that strict scrutiny should be applied in evaluating this challenge because a fundamental right—freedom of speech—is involved.[12]

We have rejected the Advertisers' First Amendment challenge to the TCPA's ban on unsolicited fax advertisements; therefore, strict scrutiny is not applicable to the Advertisers' equal-protection claim on the basis that a First Amendment right is involved. *See Dunagin v. City of Oxford*, 718 F.2d 738, 752 (5th Cir.1983) (stating that "[i]n this case we have held the Mississippi law entirely legal under the First Amendment, and parties cannot insist on

---

**11.** The Advertisers assert that this scienter argument was a separate summary-judgment ground that the Recipients did not attack on appeal; however, we conclude that the Recipients sufficiently assigned error in this regard

in the First Amendment section of their appellate brief.

**12.** The Advertisers have not addressed their equal-protection challenge on appeal.

strict scrutiny merely by asserting a First Amendment right that the court ultimately finds not to be violated"). No other fundamental right or suspect class is implicated by the Advertisers' equal-protection challenge. *See Am. Blastfax, Inc.,* 121 F.Supp.2d at 1093. We already have determined for First Amendment purposes that a "reasonable fit" exists between the TCPA's identified interests and the means used to protect these interests. This same analysis is sufficient to satisfy the equal-protection rationality review. *See Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 344 n. 9, 106 S.Ct. 2968, 2978 n. 9, 92 L.Ed.2d 266 (1986) (stating "[i]f there is a sufficient 'fit' between the legislature's means and ends to satisfy the concerns of the First Amendment, the same 'fit' is surely adequate under the applicable 'rational basis' equal protection analysis"). Further, because Congress has substantial and valid interests in protecting "unwitting customers" from unsolicited fax advertisements, the TCPA's distinction between commercial and noncommercial advertising is quite rational. *See Destination Ventures,* 844 F.Supp. at 639; *Am. Blastfax, Inc.,* 121 F.Supp.2d at 1093. Therefore, we find the trial court erred in granting summary judgment based on its implied ruling that the TCPA violates the Equal Protection Clause of the United States Constitution.

## G. Did the Advertisers conclusively prove their entitlement to judgment as a matter of law on their statute-of-limitations defense?

In their individual motions for summary judgment, both GTE Mobilnet and Chick-Fil-A asserted the statute of limitations as a bar to the Recipients' TCPA claims. The main issue presented by this challenge is whether the federal, four-year statute of limitations or state statutes of limitations apply to private TCPA actions. This ap-

pears to be an issue of first impression under the TCPA.

The Advertisers and the Recipients agree that the Recipients' common-law claims are governed by the two-year statute of limitations under section 16.003(a) of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem.Code § 16.003(a). However, the Recipients assert that the residual, federal limitations period applies to their private claims under the TCPA. *See* 28 U.S.C. § 1658(a).

### 1. Chick–Fil–A

Chick–Fil–A asserts correctly that, as to the TCPA claims, this case involves a "reverse-*Erie*" situation, in which the substantive law is federal and the procedural law is that of Texas. *See, e.g., Exxon Corp. v. Choo,* 881 S.W.2d 301, 305–06 & n. 9 (Tex.1994) (discussing "reverse-*Erie*" situation involving a federal maritime claim in state court). Chick–Fil–A argues in part that, in this reverse-*Erie* situation, the Texas limitations period applies because statutes of limitations are procedural and Texas law supplies the procedure. To support its position, Chick–Fil–A cites to *Hill v. Perel,* 923 S.W.2d 636, 639 (Tex. App.-Houston [1st Dist.] 1995, no writ), a case holding that limitations is generally procedural in a case in a Texas court in which the substantive law of another state applies. As applied to the TCPA, Chick–Fil–A's argument lacks merit for two reasons.

First, if Congress has enacted a statute that requires a four-year limitations period for the federal claim asserted in this case, then that federal law would preempt any contrary state-law analysis. *See Anderson v. Diamond M-Odeco, Inc.,* 912 S.W.2d 371, 372–73 (Tex.App.-Houston [14th Dist.] 1995, writ dism'd by agr.) (holding three-year maritime-tort statute of limitations

under 46 U.S.C. § 763a applies to maritime torts filed in state court).

Second, this argument fails to recognize a historical difference between limitations rules in two different contexts: (1) *Erie* and reverse-*Erie* situations, and (2) situations in which Texas courts apply the substantive law of a foreign jurisdiction, which does not include federal law. When Texas courts apply foreign law from another state or country, the rule has been that the foreign jurisdiction supplies the substantive law, and Texas supplies the procedural law, and this procedural law has been held to include the statute of limitations, unless the statute that created the claim contains an express limitations period. *See Hill,* 923 S.W.2d at 639. However, in *Erie* and reverse-*Erie* situations, courts have determined that, rather than decide the potentially difficult issue of whether limitations is procedural or substantive, the rule should simply be that the limitations period comes from the same source as the substantive law. *See Guaranty Trust Co. of N.Y. v. York,* 326 U.S. 99, 108–11, 65 S.Ct. 1464, 1469–71, 89 L.Ed. 2079 (1945) (holding that, in *Erie* situation—diversity claim in federal court—regardless of whether statutes of limitations are procedural or substantive, state statutes of limitations apply to maintain uniformity of outcomes among similar claims, regardless of whether they are brought in state court or federal court); *Engel v. Davenport,* 271 U.S. 33, 39, 46 S.Ct. 410, 413, 70 L.Ed. 813 (1926) (holding that limitations period in federal statute that governed personal-injury claim applied to state-court claim under that statute rather than state limitations period). This difference in the law has been diminished somewhat by the Texas Legislature's fairly recent enactment of a statute adopting the foreign state or country's statute of limitations for personal-injury or death claims under foreign law in Texas courts, if the claimant is not a resident of Texas. *See* Act of May 27, 1997, 75th Leg., R.S., ch. 424, § 3, 1999 Tex. Gen Laws 1680, 1683 (codified at Tex Civ. Prac. & Rem Code § 71.031(a)(3)). In any event, even if we were to conclude that statutes of limitations are "procedural," that would not answer the question now before us. Instead, we must interpret and apply the federal statute the Recipients claim governs this case. That statute states:

> Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.

28 U.S.C. § 1658(a).

The Recipients' TCPA claims arise under an act of Congress, the TCPA. Congress enacted the TCPA after it enacted section 1658(a). *See* 47 U.S.C.A. § 227; 28 U.S.C.A. 1658. Therefore, the four-year statute of limitations in section 1658(a) applies to the TCPA claims unless another law provides otherwise. *See* 28 U.S.C. § 1658(a).

Chick–Fil–A asserts that another law—47 U.S.C. § 227(b)(3)—does provide otherwise because that statute specifies that private damage claims may be brought in state court "if otherwise permitted by the laws or rules of court of a State." 47 U.S.C. § 227(b)(3). This is a difficult issue and one of apparent first impression in the United States. After careful study and examination, we agree with Chick–Fil–A's position. Under the opt-out interpretation of section 227(b)(3) that we now have adopted, parties may assert private TCPA claims in an appropriate state court if state law permits. Therefore, if Texas limitations law does not permit the Recipients to pursue their claims against Chick–Fil–A, then the Re-

cipients' claims are not "otherwise permitted" by Texas law.

Though Congress could have enacted a TCPA private damage claim with a four-year federal limitations period, our federal lawmakers had the flexibility and discretion to enact a statute that allows states to exercise control over these federal claims in the state-court system. In this way, if these claims are not a burden on the state's judicial system, then the state need not take any action. Conversely, if the TCPA claims start to become a burden on the state-court system, either due to unmanageable quantities or because of increased scarcity of resources in the state's judicial system, then the TCPA allows states to take responsive action either by closing their courts to these claims or by shortening the limitations period to reduce the number of claims its judicial system must handle. State attorneys general still would be able to obtain the same relief in federal court, and this might be a more efficient arrangement in the judgment of some states. Given the TCPA's language, the congressional purposes in enacting it, and the statute's legislative history, we cannot conclude that Congress intended to force the states to hear these private TCPA claims with a long four-year limitations period, when many states have a one-year or two-year limitations period for tort claims. *See International Science & Tech. Inst.*, 106 F.3d at 1157 (stating that "concerned over the potential impact of private actions on the administration of state courts, Congress included a provision to allow the states to prohibit private TCPA actions in their courts. We have no doubt that Congress has a legitimate interest in not overburdening state and federal courts [or] that Congress has a legitimate interest in respecting the states' judgments about when their courts are overburdened"). Therefore, we conclude that the residual four-year federal limitations statute does not apply to private TCPA claims.

Under Texas law, if the Texas Supreme Court has not held that a tort is governed by a statute of limitations other than section 16.003(a) of the Texas Civil Practice and Remedies Code and if that tort is not expressly covered by a statute of limitations, then we presume the tort is a "trespass" that is covered by the two-year statute of limitations of section 16.003(a). *See* Tex. Civ. Prac. & Rem.Code § 16.003(a); *Williams v. Khalaf,* 802 S.W.2d 651, 654 (Tex.1990); *Almazan v. United Services Automobile Assoc.,* 840 S.W.2d 776, 779–80 (Tex.App.—San Antonio 1992, writ denied) (applying *Khalaf* presumption regarding section 16.003(a) to statutory tort based on wrongful dismissal for filing workers' compensation claim). The Recipients' private TCPA claims are tort claims. Further, because the Texas Supreme Court has not held that private TCPA claims are governed by a statute of limitations other than section 16.003(a) and because such claims are not expressly covered by a statute of limitations, we presume that private TCPA claims are covered by section 16.003(a). *See* Tex. Civ. Prac. & Rem.Code § 16.003(a); *Williams,* 802 S.W.2d at 654; *Almazan,* 840 S.W.2d at 779–80. This presumption has not been overcome. We conclude that the Recipients' private TCPA claims are covered by the language of section 16.003(a)'s two-year statute of limitations. *See* Tex. Civ. Prac. & Rem.Code § 16.003(a) (stating that two-year statute of limitations covers, among other things, "trespass for injury to the estate or to the property of another, conversion of personal property, taking or detaining the personal property of another, personal injury...."); *Almazan,* 840 S.W.2d at 779–80 (holding statutory tort based on wrongful dismissal for filing workers' compensation claim is governed by section 16.003(a)'s two-year statute of limitations rather than by the

residual four-your statute of limitations); *Collins v. Collins*, 904 S.W.2d 792, 804 (Tex.App.-Houston [1st Dist.] 1995) (holding claim under Texas wiretap statute is governed by section 16.003(a)'s two-year statute of limitations rather than by the residual four-your statute of limitations) (en banc), *writ denied*, 923 S.W.2d 569 (Tex.1996). Thus, we evaluate the timeliness of the Recipients' TCPA claims by calculating whether they were brought within two years of accrual.

The type of TCPA claim asserted by the Recipients accrues when the defendant sends an unsolicited advertisement to the plaintiff's fax machine. *See* 47 U.S.C. § 227(b)(1)(C), (b)(3). The parties do not dispute that the Recipients sued Chick–Fil–A for the first time on March 11, 1998. The Recipients have not cited, and this court has not found, any summary-judgment evidence raising a genuine issue of material fact as to whether the Recipients received any fax advertisement from Chick–Fil–A on or after March 11, 1996. The only evidence on this point shows that all of the fax advertisements Chick–Fil–A allegedly sent to the Recipients were sent before March 11, 1996, which is more than two years before the Recipients filed suit against Chick–Fil–A. Accordingly, we conclude that the trial court acted correctly in granting Chick–Fil–A's motion for summary judgment based on limitations, and we overrule the Recipients' issue on appeal to the extent that it challenges the take-nothing judgment in favor of Chick–Fil–A.

### 2. GTE Mobilnet

GTE Mobilnet also moved for summary judgment on the ground that the statute of limitations barred the Recipients' TCPA claims. However, the record shows that the Recipients' action against GTE Mobilnet (the Federal Suit) was dismissed for lack of jurisdiction on January 12, 1998, and that the Recipients brought suit against GTE Mobilnet in this case 58 days later, on March 11, 1998. Therefore, under Texas limitations law, the date of filing as to the claims against GTE Mobilnet relates back to April 12, 1995—the date the Recipients filed the Federal Suit against GTE Mobilnet. *See* Tex. Civ. Prac. & Rem.Code § 16.064. None of the fax advertisements in the record on which the Recipients base their claims against GTE Mobilnet were sent before April 12, 1993. Therefore, the trial court erred in granting summary judgment based on its implied ruling that the Recipients' claims against GTE Mobilnet were barred by limitations.

### H. Did the trial court err by granting GTE Mobilnet summary judgment based on its assertion that independently owned and operated agents, rather than GTE Mobilnet, sent the faxes in question?

■ The trial court also granted summary judgment based on its implied ruling that GTE Mobilnet's independently owned and operated agents, rather than GTE Mobilnet, sent the GTE Mobilnet fax advertisements. In support of GTE Mobilnet's motion for summary judgment, Jeffrey L. Sicard testified by affidavit that he is a general manager for GTE Mobilnet and that the fax advertisements in question relating to GTE Mobilnet "were not sent by GTE Mobilnet of Houston, Inc., but were sent by independently owned and operated agents." Applying the familiar standards of review for summary judgment, this affidavit by itself raised a genuine issue of material fact as to whether GTE Mobilnet used any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to one or more of the Recipients.

The TCPA does not require that GTE Mobilnet or its employees be the ones to actually send unsolicited fax advertisements for liability to attach. *See Hooters of Augusta, Inc.*, 537 S.E.2d at 472; *see also Worsham*, 772 A.2d 868, 877–79 (stating, in context of damage action under 47 U.S.C. § 227(c)(5), that under TCPA, defendant still can be liable, even if independent contractor made the call on defendant's behalf). Under the TCPA, "the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the [TCPA's] rule banning unsolicited facsimile advertisements." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC Release No. 95–310, 10 F.C.C. Rcd. 12391, 12407 (Aug. 7, 1995). Parties wishing to send unsolicited fax advertisements in violation of the TCPA should not be able to avoid liability simply by having the transmission executed by an independent contractor. *Hooters of Augusta, Inc.*, 537 S.E.2d at 472. A reasonable inference from Sicard's affidavit would be that GTE Mobilnet and its employees did not send the faxes in question but that one of GTE Mobilnet's independent agents sent these faxes. *See Dolcefino*, 19 S.W.3d at 916. Therefore, we conclude that there is a genuine issue of material fact as to whether the fax advertisements in question were sent by someone acting on behalf of GTE Mobilnet. *See Worsham*, 772 A.2d at 878–79 (finding

fact issue under TCPA as to whether phone calls were made on behalf of defendant).[13] Accordingly, we conclude the trial court erred to the extent that it impliedly ruled that GTE Mobilnet was entitled to summary judgment based on its assertion that independently owned and operated agents, rather than GTE Mobilnet, sent the GTE Mobilnet fax advertisements.

**I. Did the Recipients raise a genuine issue of material fact in response to GTE Mobilnet's assertion that there is no evidence GTE Mobilnet sent unsolicited fax advertisements to any of the Recipients?**

GTE Mobilnet filed no-evidence motions for summary judgment directed to the claims of certain of the Recipients. We now consider the propriety of the trial court's implied rulings granting these motions.

**1. The Chair King, Inc., Chair King, S.A., Inc., M.E. Ford and Associates, Vantage Shoe Warehouse, Inc., Counselor Systems, Inc., Pope and Booth, P.C., and Pope Escrow Company**

The following parties did not adduce any summary-judgment evidence showing that they received any fax advertisements from GTE Mobilnet: The Chair King, Inc., Chair King, S.A., Inc., M.E. Ford and Associates, Vantage Shoe Warehouse, Inc., Counselor Systems, Inc., Pope and Booth,

---

**13.** GTE Mobilnet also cites a second affidavit from Sicard that was filed in response to the Recipients' motion for partial summary judgment. Sicard's first affidavit already raises a fact issue, and that fact issue cannot be erased by Sicard filing a second affidavit. Further, it is not clear that the second Sicard affidavit speaks to GTE Mobilnet at all because it defines "GTE Mobilnet" in a way that seems to refer to GTE Mobilnet of South Texas Limited Partnership rather than to defendant/appellee GTE Mobilnet of Houston Inc. Although the second affidavit does state that the fax adver-

tisements were not sent by "GTE Mobilnet" or on its behalf or at its request, this statement alone is conclusory and insufficient to support summary judgment in favor of GTE Mobilnet. *See Anderson v. Snider*, 808 S.W.2d 54, 55 (Tex.1991). Lastly, although the second affidavit states that the fax advertisements in question appear to have been sent by independent contractors, this is not sufficient to entitle GTE Mobilnet to summary judgment. *See Worsham*, 772 A.2d 868, 877–79; *Hooters of Augusta, Inc.*, 537 S.E.2d at 472.

P.C., and Pope Escrow Company. Based on these parties' failure to raise a genuine issue of material fact as to whether they received any unsolicited fax advertisement from GTE Mobilnet, we conclude that the trial court properly granted summary judgment as to all of these parties' claims against GTE Mobilnet.

### 2. Jerome Kosoy, M.D., Beautique, Inc., Discovery Services of Texas, Inc., hand Jeffrey K. Musker, D.C.

As to Jerome Kosoy, M.D., Beautique, Inc., Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C., we conclude that these four parties raised genuine issues of material fact as to whether GTE Mobilnet sent them unsolicited fax advertisements. In their affidavits, these parties asserted that the fax advertisements appended as attachments (which include advertisements for GTE Mobilnet) were sent to them by the defendants, a group that includes GTE Mobilnet. This evidence and the first affidavit of Jeffrey Sicard (discussed in section H., above) raise a genuine issue of material fact as to the elements of these parties' private TCPA claims. Therefore, the trial court erred to the extent it granted summary judgment as to the TCPA claims of Jerome Kosoy, M.D., Beautique, Inc., Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C.

### 3. Jerome Kosoy, M.D.

█ As an additional ground for summary judgment as to Jerome Kosoy, M.D.'s claims, GTE Mobilnet asserted that it presumptively had permission to send him fax advertisements because it was not disputed that, at all relevant times, Kosoy was a customer of GTE Mobilnet. The TCPA prohibits sending fax advertisements to a person without that person's "prior express invitation or permission." *See* 47 U.S.C. §§ 227(a)(4) and (b)(1)(C). The FCC has stated that "facsimile trans-

mission [sic] from persons or entities who have an established business relationship with the recipient can be deemed to be invited or permitted by the recipient." *See* 7 F.C.C.R. 8752, n. 87, 1992 WL 690928 (1992). This notion of deeming permission is based on an inference and, as such, seems to conflict with the TCPA's requirement that the invitation or permission be express. *See* 47 U.S.C. § 227(a)(4). Characterizing permission granted by implication as "express" runs afoul of the plain meaning of the word. Generally, "express" means "clearly and unmistakably communicated; directly stated." Black's Law Dictionary 601 (7th ed.1999); *see also Lehmann v. Har–Con Corp.*, 39 S.W.3d 191, 192–93, 200, 205–06 (Tex.2001) (equating "express" with "states with unmistakable clarity" and with "clearly and unequivocally states"). Kosoy testified that he did not give prior express invitation or permission to the defendants (which includes GTE Mobilnet) to send the fax advertisements attached to his affidavit. Kosoy testified he did not want to receive these unsolicited fax advertisements and that he did not give prior express invitation or permission to GTE Mobilnet to send them. Under the applicable standard of review, we find that Kosoy raised a genuine issue of material fact as to whether he gave prior express invitation or permission.

### J. Did the Recipients raise a genuine issue of material fact in response to GTE Mobilnet's assertion that there is no evidence to support their common-law claims against GTE Mobilnet?

In addition to granting summary judgment on the Recipients' TCPA claims, the trial court also granted summary judgment in favor of GTE Mobilnet on the Recipients' common-law claims. We now

consider the Recipients' challenges to these rulings.

## 1. Invasion of Privacy

■ As to the intrusion-upon-seclusion invasion-of-privacy claims, we conclude that the trial court properly granted summary judgment as to the claims of Jerome Kosoy, M.D., Beautique, Inc., Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C. against GTE Mobilnet. Certainly, sending unauthorized fax advertising may constitute invasion of privacy in some circumstances. *See International Science & Tech. Inst.*, 106 F.3d at 1150 (discussing legislative history of TCPA that states TCPA seeks to protect the privacy interests of residential telephone subscribers by restricting unsolicited phone and fax calls). However, as to Beautique, Inc. and Discovery Services of Texas, Inc., there is no Texas authority recognizing a corporation's right to solitude, seclusion, or privacy, and we decline to recognize one here. *See Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 900 (Tex. App.—Dallas 2001, no pet.) (stating no Texas authority recognizes a corporation's right to privacy).

■ Further, the two elements of this claim are: (1) an intentional intrusion, physically or otherwise, upon another's solitude, seclusion, or private affairs or concerns, (2) that would be highly offensive to a reasonable person. *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex.1993). The summary-judgment evidence does not raise a genuine issue of material fact on either element for the claims of the individual claimants Jerome Kosoy, M.D. and Jeffrey K. Musker, D.C. According to Kosoy's affidavit, the address at which his fax machine is located contains a suite number, indicating an office address. In any event, neither claimant describes the circumstances surrounding his receipt of the fax advertisements in question. Neither describes the location of the fax machine or the expectation of solitude, seclusion, or privacy that he claims relating to this fax machine. Both failed to provide details regarding the facts that might bear on the offensiveness of GTE Mobilnet's alleged conduct.

On this record, we conclude the trial court correctly granted summary judgment against these four claimants regarding their invasion-of-privacy claims. *See Express One Int'l, Inc.*, 53 S.W.3d at 900–01 (affirming summary judgment where claimant did not adduce evidence raising fact issue as to invasion-of-privacy claim).

## 2. Trespass to Chattels

■ As to the trespass-to-chattels claim, for liability to attach, the wrongful interference with the chattel must have caused actual damage to the property or deprived the owner of its use for a substantial period. *See Zapata v. Ford Motor Credit Co.*, 615 S.W.2d 198, 201 (Tex.1981); *Omnibus Int'l, Inc.*, 111 S.W.3d at 826. Applying the familiar standard of review, we conclude Jerome Kosoy, M.D., Beautique, Inc., Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C. did not raise a genuine issue of material fact in this regard. Accordingly, the trial court correctly granted summary judgment as to the trespass-to-chattels claim. *See Omnibus Int'l, Inc.*, 111 S.W.3d at 826.

## 3. Negligence, Negligence Per Se, and Gross Negligence

As to the negligence and negligence per se claims, Jerome Kosoy, M.D., Beautique, Inc., Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C. have not adduced any evidence giving rise to a common-law negligence duty regarding the alleged actionable conduct. Furthermore, under the negligence per se analysis established by

the Texas Supreme Court, this case does not involve a claim deriving the duty from the common law, and so, we conclude that this is not an appropriate case for negligence per se. *See Perry v. S.N.*, 973 S.W.2d 301, 306–07 (Tex.1998). As to the gross negligence allegation, applying the familiar standard of review, we find no evidence that GTE Mobilnet engaged in grossly negligent conduct. Accordingly, the trial court correctly granted summary judgment as to these claims.

#### 4. Civil Conspiracy

 A civil conspiracy is a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex.1996). The "gist of a civil conspiracy" is the injury the conspirators intend to cause. *Id.* Civil conspiracy requires specific intent. *Id.* For a civil conspiracy to arise, the parties must be aware of the harm or the wrongful conduct at the beginning of the combination or agreement. *Id.* Reviewing the record under the applicable standard of review, we find no evidence that Adverfax and GTE Mobilnet had a meeting of the minds and knew that damage would result from sending unsolicited fax advertisements to any of the Recipients. Accordingly, we find the trial court correctly granted summary judgment on this issue.

In sum, we conclude that the trial court correctly granted summary judgment against Jerome Kosoy, M.D., Beautique, Inc., Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C. as to all of their common-law claims.

#### K. Can the Recipients appeal from the trial court's denial of the motion for partial summary judgment?

 The Recipients' motion for partial summary judgment did not seek a final judgment. Therefore, we lack appellate jurisdiction to review the trial court's denial of this motion. *See CU Lloyd's of Texas v. Feldman*, 977 S.W.2d 568, 569 (Tex. 1998) (stating that, before a court of appeals may review an order denying a cross motion for summary judgment not covered by an interlocutory appeal statute, both parties must have sought final judgment in their cross motions for summary judgment, unless an exception applies that involves declaratory relief). Because we may not address an issue not properly before this court, we do not consider the trial court's denial of the Recipients' motion for partial judgment in this appeal.

### IV. CONCLUSION

The opt-out interpretation of the "if otherwise permitted" phrase is most consistent with the language, articulated goals, and legislative history of the TCPA. Therefore, the trial court erred by impliedly granting summary judgment based on the opt-in interpretation. Under this same phrase, the residual four-year federal statute of limitations does not apply when private actions are being asserted in Texas courts; rather, Texas limitations law applies. Under this law, the trial court correctly granted Chick–Fil–A summary judgment because the summary-judgment evidence proved as a matter of law that Chick–Fil–A did not send any allegedly unsolicited fax advertisement to any of the Recipients within the two-year period before the Recipients sued Chick–Fil–A in this case. However, the trial court erred in granting summary judgment in favor of GTE Mobilnet based on limitations. The trial court also erred by impliedly finding the TCPA applies only to interstate fax advertisements and by impliedly granting summary judgment based on the Advertisers' constitutional arguments. There is a

genuine issue of material fact as to whether GTE Mobilnet sent unsolicited fax advertisements to appellants Jerome Kosoy, M.D., Beautique, Inc., Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C. The trial court properly granted summary judgment regarding the Recipients' common-law claims. This court has no jurisdiction to review the trial court's denial of the Recipients' motion for partial summary judgment.

Because the trial court correctly granted summary judgment as to the Recipients' common-law claims, all of their claims against appellee Chick–Fil–A, Inc., and the claims of The Chair King, Inc., Chair King, S.A., Inc., M.E. Ford and Associates, Vantage Shoe Warehouse, Inc., Counselor Systems, Inc., Pope and Booth, P.C., and Pope Escrow Company under the TCPA, we affirm these rulings. However, we reverse the trial court's judgment as to the TCPA claims of appellants Jerome Kosoy, M.D., Beautique, Inc., Discovery Services of Texas, Inc., and Jeffrey K. Musker, D.C. against appellee GTE Mobilnet, and we remand these claims for further proceedings consistent with this opinion. We order the Recipients to pay any costs of appeal that have been incurred by Chick–Fil–A. Based on our holdings, we find good cause to apportion the costs of appeal incurred by the Recipients and GTE Mobilnet equally between the Recipients and GTE Mobilnet. *See* Tex.R.App. P. 43.4. Therefore, for good cause and in the interest of justice, we order the Recipients and GTE Mobilnet each to pay one-half of the aggregate appellate costs incurred by these parties in this case.