Petition for Writ of Mandamus Denied; Majority and Concurring Opinions
of December 3, 2004 Withdrawn; and Substitute Majority and Concurring Opinions
filed February 24, 2005









Petition
for Writ of Mandamus Denied; Majority and Concurring Opinions of December 3,
2004 Withdrawn; and Substitute Majority and Concurring Opinions filed February
24, 2005.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-04-00514-CV

____________

 

IN RE SHARON ELIZABETH
SULLIVAN, Relator

 

____________________________________________________________

 

ORIGINAL PROCEEDING

WRIT OF MANDAMUS

____________________________________________________________

 

S U B S T I T U T E   M A J O R I
T Y   O P I N I O N

This original proceeding presents a question of
first impression under the Texas Family Code:  Does an unmarried man who donated sperm to an
unmarried woman for the conception of a child have standing to maintain a
proceeding to adjudicate parentage of the resulting child?  








Relator Sharon Sullivan seeks a petition for writ
of mandamus commanding the respondent, the Honorable Bonnie Hellums, Judge of
the 247th Judicial District Court of Harris County, to (1) vacate her order denying
Sullivan=s plea to
the jurisdiction and (2) dismiss for lack of standing the proceeding to
adjudicate parentage filed by real party in interest Brian Keith Russell.  We conclude that, under section 160.602(3) of
the Texas Family Code, the respondent did not clearly abuse her discretion in
ruling that Russell has standing to maintain a proceeding to adjudicate
parentage.  Accordingly, we deny Sullivan=s
petition for writ of mandamus.

I.  Factual and Procedural Background

Sullivan is an unmarried woman.  Russell is an unmarried man.  Neither has been married previously.  Sullivan wanted to conceive a child.  Russell agreed to provide his sperm so that
Sullivan could be artificially inseminated. 
Russell and Sullivan signed a ACo-Parenting
Agreement@ on February 6, 2003,[1]
which recites these facts and, in addition, states the following:

3.         BRIAN KEITH RUSSELL has agreed to provide his semen to
SHARON SULLIVAN for the purpose of donor insemination.

4.         Each party agrees that SHARON SULLIVAN=s decision to conceive and
bear a child was actually a joint decision of the parties and based upon the
commitment of each party to parent the child.

5.         Each party agrees that, during the calendar year 2003,
SHARON SULLIVAN will attempt to become pregnant through the procedure of donor
insemination, and that such inseminations will continue until conception
occurs.

6.         Each party agrees that any child born as a result of the
donor insemination procedure will be the child of BRIAN KEITH RUSSELL as if he
and SHARON SULLIVAN were married at the time of conception, and that BRIAN
KEITH RUSSELL will be named as the father on the child=s birth certificate.

. . . 








11.       The parties agree that SHARON SULLIVAN shall provide the
primary residence for the child as long as she is able to do so.  The parties agree that BRIAN KEITH RUSSELL
shall have possession of the child at any and all times mutually agreed to in
advance by the parties.  Failing mutual
agreement, BRIAN KEITH RUSSELL shall have possession of the child under the
specified terms set out the [sic] Standard Possession Schedule attached to this
agreement and incorporated herein.  

Insemination and conception were successful in
June 2003, and the resulting child, L.J.S., was born on March 2, 2004.  However, before the child=s birth,
a disagreement arose between Russell and Sullivan, and on March 31, 2004,
Russell filed an AOriginal
Petition to Adjudicate Parentage, Suit Affecting the Parent-Child Relationship
and Breach of Contract@ in the
trial court.  In this pleading, Russell
alleges he is L.J.S.=s father
and seeks the following relief:  

(1)       a decree establishing a parent-child relationship between
L.J.S. and  Russell;

(2)       an order appointing Russell and Sullivan as joint managing
conservators of L.J.S.;

(3)       temporary orders appointing Russell and Sullivan as joint
managing conservators of L.J.S., ordering Sullivan to submit L.J.S. for genetic
testing to affirm the parentage, and ordering that a standard possession order
be put in place and that visits between Russell and L.J.S. begin immediately;

(4)       injunctive relief preventing Sullivan from hiding L.J.S.,
removing L.J.S. from a geographical boundary to be defined by the court, and
from using for any purpose, especially conceiving a child, any frozen or
preserved sperm from Russell; and

(5)       attorney=s fees
and recovery for breach of contract and promissory estoppel, including damages
for mental anguish.

Sullivan
filed a plea to the jurisdiction, claiming that under the Texas Family Code,
Russell lacks standing to bring a proceeding to adjudicate parentage because he
is a sperm donor with no parental rights. 
After a hearing, the trial court ruled that Russell had standing and
denied Sullivan=s plea to
the jurisdiction.  Sullivan then filed a
petition for writ of mandamus in this court alleging that the trial judge
clearly abused her discretion by finding that Russell has standing to maintain
a proceeding to adjudicate his parentage of L.J.S.  








II.  Standard
of Review

To obtain
mandamus relief, Sullivan, as the relator, must demonstrate (1) that the lower
court committed a clear abuse of discretion, (2) for which there is no adequate
remedy at law, such as a normal appeal.  Walker
v. Packer, 827 S.W.2d 833, 839B40 (Tex.
1992).  Both Russell and Sullivan agree
that Sullivan would have no adequate remedy at law if the trial court clearly
abused its discretion.[2]  In deciding whether the trial court clearly
abused its discretion in determining that Russell has standing to maintain a
proceeding to adjudicate parentage (hereinafter Aparentage
proceeding@), we do not consider the
underlying merits of the case.  

III.  Analysis

Standing
is a prerequisite to subject-matter jurisdiction, which is essential to a court=s power
to decide a case.  Bland Indep. Sch.
Dist. v. Blue, 34 S.W.3d 547, 553B54 (Tex.
2000). A party may challenge the absence of subject-matter jurisdiction by a
plea to the jurisdiction and by other procedural vehicles.  Id. at 554.  A plea to the jurisdiction is a dilatory
plea, the purpose of which is to defeat the alleged claims, without regard to
whether they have merit.  Id.  The purpose of a dilatory plea is not to
force a plaintiff to preview its case on the merits, but to establish a reason
why the merits of its case should never be reached.  Id. 
The Texas Supreme Court has emphasized that a court should not decide
standing issues based on its views of the merits:








In deciding a plea to the
jurisdiction, a court may not weigh the claims= merits but must consider
only the plaintiffs= pleadings and the
evidence pertinent to the jurisdictional inquiry.  When we consider a trial court=s order on a plea to the
jurisdiction, we construe the pleadings in the plaintiff=s favor and look to the
pleader=s intent.

Id. at 554B55.  

A trial
court accepts the factual allegations in the petition as true, unless the
defendant pleads and proves the allegations were made fraudulently to confer
jurisdiction.  Id. at 554; TAC
Realty, Inc. v. City of Bryan, 126 S.W.3d 558, 561 (Tex. App.CHouston
[14th Dist.] 2003, pet. denied).  When
reviewing a trial court=s order
on a plea to the jurisdiction, an appellate court may look to evidence outside
of the pleadings:

[T]he issues raised by a
dilatory plea are often such that they cannot be resolved without hearing
evidence.  And because a court must not
act without determining that it has subject-matter jurisdiction to do so, it
should hear evidence as necessary to determine the issue before proceeding with
the case.  But the proper function of a
dilatory plea does not authorize an inquiry so far into the substance of the
claims presented that plaintiffs are required to put on their case simply to
establish jurisdiction.

. . . 

The court should, of
course, confine itself to the evidence relevant to the jurisdictional
issue.  

Bland
Indep. Sch. Dist., 34 S.W.3d 554B55. 

Standing
is a constitutional prerequisite to suit in both federal courts and the courts
of Texas.  Williams v. Lara, 52
S.W.2d 171, 178 (Tex. 2001). 
Nonetheless, the judge-made criteria regarding standing do not apply
when the Texas Legislature has conferred standing through a statute.  Id. 
In statutory standing cases, such as this, the analysis is a straight
statutory construction of the relevant statute to determine upon whom the Texas
Legislature conferred standing and whether the claimant in question falls in
that category.  See Tex. Dep=t of
Protective and Regulatory Servs. v. Sherry, 46 S.W.3d 857, 859B61 (Tex.
2001) (determining whether putative father had standing to maintain a suit
affecting the parent-child relationship based solely on construction of
statutory standing provision).  








Russell
asserts that he has standing under a statute that allows Aa man
whose paternity of the child is to be adjudicated@ to
maintain a parentage proceeding.  See
Tex. Fam. Code Ann. ' 160.602 (Vernon Supp. 2004).  It is
undisputed that Russell is a man, but Sullivan asserts that Russell is not Aa man whose
paternity is to be adjudicated@ because, Sullivan claims, Russell is a Adonor@ who lacks
parental rights and standing to maintain a parentage proceeding.  See Tex.
Fam. Code Ann. ' 160.102 (6) (Vernon 2002)
(defining Adonor@ as Aan individual who produces eggs or sperm used for assisted
reproduction, regardless of whether the production is for consideration@ but excluding
from this definition Aa husband who provides sperm or a wife who provides eggs to
be used for assisted reproduction by the wife . . . or . . . a woman who gives
birth to a child by means of assisted reproduction@).  Sullivan asserts that section 160.702 of the
Texas Family Code deprives Russell of standing because, under that section, Aa donor is not a
parent of a child conceived by means of assisted reproduction.@  See Tex.
Fam. Code Ann. ' 160.702 (Vernon 2002).  

It is undisputed that L.J.S. was conceived by means of
assisted reproduction using Russell=s sperm and that
Russell and Sullivan are not married to each other.  Nonetheless, Russell asserts that section
160.702 does not apply to a known donor of sperm who executed a ACo-Parenting
Agreement@ under which the donor intended to assume an active role as
father of the child conceived by means of assisted reproduction.  In the alternative, Russell asserts that, to
the extent that section 160.702 is found to deprive him of parental status
under these circumstances, it is unconstitutional under various theories. 








Before reaching the issue of whether Russell is a donor who
lacks parental rights, we first must determine whether, under the proper
statutory construction, donor status[3]
is part of the inquiry as to whether Russell has standing to maintain a
parentage proceeding.  If, under the
statutory standing criteria, Russell has standing as a Aman whose
paternity of the child is to be adjudicated,@ even though, on
the merits, the trial court may decide that he is a donor with no parental
rights, then the issue of Russell=s status as a
donor is not relevant to standing, and this court must presume (for standing
purposes only) that Russell=s claims have merit, that is, that he is not a donor and that
he has parental rights.  See Bland
Indep. Sch. Dist., 34 S.W.3d at 554B55 (stating that
court should not decide standing based on its views of the merits of the
asserted claims).  On the other hand, if
the statute requires that men disprove donor status before they can have
standing to maintain a parentage proceeding, then we must address whether
Russell is a donor.  








The term Aman whose paternity of the child is to be adjudicated@  is not defined in the Texas Family Code.[4]  This term was created in the recent revisions
to the Uniform Parentage Act (AUPA@).  So far, only a few
states have adopted these revisions, and research reveals no cases addressing
the meaning of this statutory phrase.  See
UPA (2000), section 602.  On its
face, the term lacks clarity.  This
phrase seems to beg the question that it is intended to answer.  We look to section 160.602 as the statutory
standing provision to tell us who has standing to maintain parentage proceedings,
yet this section states that all men have standing if their Aparentage is to
be adjudicated.@  This language
presents a paradox.  A man cannot seek an
adjudication of his paternity unless he has standing, yet section 160.602
states that a man generally has no standing to seek an adjudication of his
paternity unless his paternity is to be adjudicated.  See Tex.
Fam. Code Ann. ' 160.102(9) (defining Aintended parents@ as Aindividuals who
enter into an agreement providing that the individuals will be the parents of a
child born to a gestational mother by means of assisted reproduction . . . .@); Tex. Fam. Code Ann. ' 160.751 (defining a Agestational mother@ as Aa woman who
gives birth to a child conceived under a gestational agreement@); Tex. Fam. Code Ann. ' 160.752, et seq. (defining gestational
agreement as one in which woman agrees to give birth to child, relinquishing
all of her parental rights regarding the child, so that the intended parents
can be the child=s parents); Tex. Fam.
Code Ann. ' 160.602 (granting standing only to
men Awhose paternity
of the child is to be adjudicated,@ who are Arelated within
the second degree by consanguinity to the mother of the child, if the mother is
deceased,@ or who are an Aintended parent@).  

In an attempt to determine the meaning of this perplexing and
ambiguous statutory phrase, we consider the object sought to be obtained, the
circumstances under which the statute was enacted, the legislative history,
former statutory provisions, including laws on the same or similar subjects,
and the consequences of a particular construction.  See Tex.
Gov. Code Ann. ' 311.023 (Vernon 1998).  The circumstances under which the statute was
enacted and the legislative history indicate that, although Texas had not
previously enacted the entire UPA, the Texas Legislature sought to enact the
2000 version of the UPA.  See Act
of May 25, 2001, 77th Leg., R.S., ch. 821, ' 1.01, 2001 Tex.
Gen. Laws 1610 (enacting legislation substantially similar to 2000 version of
UPA); House Research Organization,
Bill Analysis, Tex. H.B. 920, 77th Leg., R.S. (May 8, 2001)
(stating that the intent of this legislation was to enact the 2000 version of
the UPA).  Beyond this, the circumstances
under which the statute was enacted and the legislative history do not speak to
the issue of which men have standing to maintain a parentage proceeding or to
the meaning of the phrase Aa man whose paternity of the child is to be adjudicated.@  

Before the Texas Legislature enacted this legislation in
2001, Texas had no analogous standing statute regarding parentage
proceedings.  Because the Texas
Legislature sought to enact the 2000 version of the UPA, we examine that
uniform act and previous versions of the UPA. 









The
original UPACthe 1973 versionChad a
provision similar to section 702 of the 2000 UPA, under which a sperm donor had
no parental rights.  See UPA
(1973), section 5.  The very next section
of the 1973 UPA dealt with who could bring an action to determine the existence
of a father and child relationship.  See
UPA (1973), section 6. Under that section, for a child that had no presumed
father, Aa man
alleged or alleging himself to be the father,@ among
others, had standing to bring an action to determine the existence of the
father and child relationship.  See
UPA (1973), section 6(c).  The 1973 UPA
allowed A[a]ny
interested party@ to bring
an action as to children with presumed fathers under certain provisions of the
UPA; however, as to children with presumed fathers under other provisions of
the UPA, a putative father had no standing to initiate a proceeding.  See UPA (1973), section 6(a), (b). The
2000 UPA eliminated this lack of standing as to certain putative fathers, in
part due to considerations regarding the Federal Family Support Act of 1988.   See UPA (2002), sections 602, 607
& cmts.  

The
Federal Family Support Act of 1988, as a condition for receiving federal
matching funds to establish paternity and to enforce child support orders,
requires states to maintain A[p]rocedures
ensuring that the putative father has a reasonable opportunity to initiate a
paternity action.@  See 42 U.S.C. '
666(a)(5)(L).  The comment to the 2000
version of the UPA that Texas enacted in 2001 states that section 602 is based
on section 6 of the 1973 UPA and Aconforms
to the mandate of 42 U.S.C. '
666(a)(5)(L) requiring that a putative father have a reasonable opportunity to
initiate a paternity proceeding.@  UPA (2000), section 602 cmt.  At the time the Texas Legislature adopted the
2000 UPA in 2001, the only comment that accompanied section 702 stated that its
source was section 4(a) of the Uniform Status of Children of Assisted
Conception Act.  See UPA (2000),
section 702 cmt.  The Uniform Status of
Children of Assisted Conception Act is short, states basic rules as to parental
rights (including the principle that the donor is not a parent of a child
conceived through assisted conception), and has no provisions that relate to
procedural issues or to
standing for maintaining parentage proceedings. 
See Uniform Status of Children of Assisted Conception
Act (1988).  













In 2002, after the Texas Legislature
adopted the 2000 version of the UPA, the National Conference of Commissioners
on Uniform State Laws adopted a revised version of the UPA.  See UPA (2002).  Although the text of sections 602 and 702 of
the UPA remained the same, the 2002 version of the UPA changed the comments to
these sections.  See UPA (2002),
sections 602, 702 cmts.  These comments
spawn confusion.  The 2002 comment to
section 602 removes the reference to the Federal Family Support Act of 1988,
although it still refers to section 6 of the 1973 UPA as the source of this
section.  See UPA (2002), section
602 cmt.  This comment also contains new
language, including the following: AThis section grants standing to a
broad range of individuals and agencies to bring a parentage proceeding. But,
several limitations on standing to sue are contained within the Act.@ 
See id.  The comment then
goes on to refer to articles 3 and 8 as well as sections 607 and 609 of the
UPA, which apparently are other Alimitations on standing to sue.@ 
See id.  Although this
comment seems to indicate that there are limitations on standing in the revised
UPA outside of section 602, the comment does not mention section 702 of the UPA
as one of these limitations.  See id.  Further, several of the sections of the UPA
to which the comment does refer do not appear to limit standing.  See id. (referring to articles 3 and 8
and sections 607 and 609 of the UPA). 
Article 3 of the UPA deals with voluntary acknowledgment of parentage,
which, once binding, may have issue or claim preclusion effect on the parentage
question.  Article 3, however, contains
no apparent limitation on standing.  See
UPA (2002), article 3.  Sections 607 and
609 of the 2002 UPA establish, in certain contexts, time limitations for
bringing proceedings to adjudicate parentage, to disprove the father-child
relationship regarding a presumed father, or to rescind an acknowledgment of
parentage; however, these sections do not state that the parties in question
lose standing.  See UPA (2002),
sections 607, 609.  Section 807 of the
UPA seems to limit the ability of a gestational mother to assert that she is
the mother of a child to whom she gave birth under a court-validated
gestational agreement.[5]
See UPA (2002), section 807. 
Although this provision arguably might be a limitation on standing, it
seems more akin to issue or claim preclusion. 









As to section 702, the comment to the
2002 UPA contains the following statements, among others: AThe donor can neither sue to
establish parental rights, nor be sued and required to support the resulting
child.  In sum, donors are eliminated
from the parental equation.@  See UPA
(2002), section 702, cmt.  This comment
suggests that donors under section 702 have no standing, and Sullivan makes
this comment the cornerstone of her argument that section 160.702 deprives
Russell of standing.  None of the
comments to section 702 of the 2002 UPA, however, were in existence when the
Texas Legislature adopted the relevant portions of sections 160.602 and 160.702
of the Texas Family Code in 2001.  Furthermore,
these are not comments made by lawmakers or any entity associated with the
Texas Legislature.  These are comments by
nonlegislators, made after the Texas Legislature enacted the statute in
question.  Therefore, these
statements are not legislative history, nor are they otherwise relevant to the
statutory-construction issue at hand.[6]  See Chair King, Inc. v. GTE Mobilnet of
Houston, Inc., 135 S.W.3d 365, 380 (Tex. App.CHouston
[14th Dist.] 2004, pet. filed) (holding post-enactment statements by
nonlegislators are irrelevant to interpretation of ambiguous statute); see
also Sullivan v. Finkelstein, 496 U.S. 617, 631, 110 S. Ct. 2658, 2667, 110
L. Ed. 2d 563 (1990) (Scalia, J., concurring in part) (stating that Apost‑enactment
legislative history@ is an oxymoron
and should not be considered in interpreting statutes and that even the
proponents of its use limit it to statements from members of the legislative
body that enacted the statute). 

The 1973
version of the UPA allowed a man alleging himself to be the father of the child
to maintain a parentage proceeding in cases, such as the one at hand, in which
the child has no presumed father.  See
UPA (1973), section 6.  The 2000 version
of the UPA changed the standing language to Aa man
whose paternity of the child is to be adjudicated.@  See UPA (2000), section 602.  Although the exact meaning of this phrase may
be elusive, its language and the comment to section 602 of the 2000 UPA
indicate that this phrase is at least as broad, if not broader than, Aa man
alleged or alleging himself to be the father.@  See UPA (2000), section 602 &
cmt.  If the Texas Legislature or the UPA
drafters had intended to exclude donors from the class of those who have
standing to maintain a parentage proceeding, they easily could have excluded
donors from the group of men Awhose
paternity is to be adjudicated.@  See, e.g., UPA (2000), section
102(3) (excluding male donors from definition of Aalleged
father,@ which
definition is not used in section 602 but is used in other sections of the 2000
UPA); Tex. Fam. Code Ann. ' 101.0015
(excluding male donors from definition of Aalleged
father@ which
term is used in various sections of the Texas Family Code, but not in section
160.602).  The omission of such an
exclusion from the statute suggests that our lawmakers intended a sperm donor
to have standing as a man Awhose
paternity is to be adjudicated.@








Because
this court deemed the construction and constitutionality of the Texas Family
Code provisions at issue in this case to be a matter of great public concern,
we requested the Attorney General of Texas to submit an amicus curiae
brief addressing the statutory construction and constitutional issues presented
in this case.  See Commissioners= Court of
Nacogdoches County. v. Weaver, 141 S.W.2d 764, 770 (Tex. Civ.
App.CBeaumont
1940), rev=d on
other grounds, 146 S.W.2d 170 (Tex. Comm=n App.
1941).  Though relying on a different legal analysis, the
Attorney General reached the conclusion that, under the Texas Family Code,
Russell has standing to maintain this parentage proceeding.

Based on
the language of the statute, the object sought to be obtained, the
circumstances under which the statute was enacted, the legislative history,
former statutory provisions, including laws on the same or similar subjects,
and the consequences of the different constructions, we conclude that, at a
minimum, section 160.602(3) confers standing on a man alleging himself to be
the biological father of the child in question and seeking an adjudication that
he is the father of that child.  We
further conclude that under the statute, as drafted, the issue of the man=s status
as a donor under section 160.702 is to be decided at the merits stage of the
litigation rather than as part of the threshold issue of standing.  It is undisputed that Russell alleges himself
to be L.J.S.=s biological father and that he
has filed a parentage proceeding seeking an adjudication that he is L.J.S.=s
father.  Based on our interpretation of
the relevant statutes and the undisputed facts germane to the issue of Russell=s
standing, we conclude that, as a matter of law, Russell has standing to
maintain a proceeding to adjudicate his parentage of L.J.S. 








Sullivan
argues forcefully that the Texas Family Code, in unambiguous language, confers
no rights on known sperm donors, such as Russell, and that this is confirmed by
the Texas Legislature=s failure
to adopt new language from the 2002 UPA that would confer parental rights on
men in Russell=s situation.  See UPA (2002), sections 703,
704.  These arguments, however, go to the
merits of this case, rather than showing that Russell lacks standing under
section 160.602(3).  The facts relevant
to the issue of whether Russell is a donor without parental rights under
section 160.702 appear to be undisputed. 
Because courts interpret statutes as a matter of law, trial and
appellate courts would have the capability, if the law so provided, to
expeditiously decide the issue of Russell=s donor
status as part of their determination of whether Russell has standing under
section 160.602.  The Texas Legislature,
however, has not made the determination of donor status part of the standing
inquiry.  See Tex. Fam. Code Ann. ' 160.602.  Because, at this juncture, the
only issue is Russell=s
standing, the trial court, in ruling on Sullivan=s plea to
the jurisdiction, was prohibited from reaching the merits of Russell=s claim
that he is not a donor under section 160.702. 
See Bland Indep. Sch. Dist., 34 S.W.3d 554B55 (stating
courts may not reach the merits of the parties= claims
in deciding the issue of standing); 
TAC Realty, Inc., 126 S.W.3d at 561B65
(stating that standing analysis is entirely separate from determination of
merits and holding that trial court erred in determining legal issue of the
constitutionality of the city=s
agreements, because that was a determination on the merits, which must not be
reached in determining standing); City of Dallas v. First Trade Union Sav.
Bank, 133 S.W.3d 680, 686 (Tex. App.CDallas
2003, pet. filed) (holding that, in interlocutory appeal regarding city=s plea to
the jurisdiction, court could not address city=s
argument that bank=s claims
against city failed as a matter of law because court may not reach the merits
of the claims in determining plea to the jurisdiction).  Likewise, in ruling on Sullivan=s
petition for a writ of mandamus regarding standing, this court cannot and does
not address the merits of Russell=s claims,
including his assertion that he is not a donor under section 160.702.[7]  See Bland Indep. Sch. Dist., 34 S.W.3d
554B55;
TAC Realty, Inc., 126 S.W.3d at 561B65;
First Trade Union Sav. Bank, 133 S.W.3d at 686. 








It is the
role of the Texas Legislature to decide whether Texas public policy would be
best served by requiring men to show they are not donors before they can have
standing to maintain a parentage proceeding. 
This court must interpret and construe the statute as written; we may
not invade the legislative field.  At
present, the Texas Family Code confers standing on Russell.  See Tex. Fam. Code Ann. ' 160.602.  Unless and until the Texas Legislature amends
the Texas Family Code to achieve the result Sullivan urges, there is no basis
to deny standing in this type of case. 
Accordingly, we find no grounds for mandamus relief.

IV.  Conclusion

The
merits of Russell=s
parentage proceeding raise important issues of apparent first impression under
Texas law.  However, under the standing
statute enacted by the Texas Legislature, we are unable to decide these
important issues in determining the standing issue that is before this
court.  See Tex. Fam. Code Ann. ' 160.602; Bland Indep. Sch. Dist., 34
S.W.3d 554B55; TAC Realty, Inc., 126
S.W.3d at 561B65; First Trade Union Sav.
Bank, 133 S.W.3d at 686.  Because
Russell is a man alleging himself to be L.J.S.=s
biological father and seeking an adjudication that he is her father, we
conclude that section 160.602 of the Texas Family Code confers standing on
Russell to maintain a parentage proceeding. 
Accordingly, we deny Sullivan=s
petition for writ of mandamus. 

 

/s/        Kem Thompson Frost

Justice

 

Petition for Writ of
Mandamus Denied; Majority and Concurring Opinions of December 3, 2004
Withdrawn, and Substitute Majority and Concurring Opinions filed February 24,
2005.

 

Panel consists of Chief Justice
Hedges and Justices Frost and Guzman. 
(Hedges, C.J., concurring.)

 

 











[1]  Sullivan was not represented by
counsel when she signed the agreement, which was drafted by an attorney
retained by Russell.  Although the
parties exchanged drafts of a modified agreement that purportedly would have
replaced their ACo-Parenting Agreement,@ the parties never reached
agreement as to any amendment, revocation, or modification of their original
agreement.





[2]  Although the
parties are in agreement on this issue, we need not and do not determine
whether Sullivan has an adequate remedy at law because we conclude that the
trial court did not clearly abuse its discretion and deny mandamus relief on
that basis.





[3]  It is
undisputed that Russell donated his sperm. 
Nonetheless, throughout this opinion, when we speak of the issue of
whether Russell is a donor, we refer to the issue of whether Russell falls
under the statutory definition of donor and therefore lacks parental rights
under section 160.702.  See Tex. Fam. Code Ann. '' 160.102(6), 160.702.





[4]  All statutory references herein are to the Texas
Family Code unless otherwise stated.





[5]  Even if one
construed article 8 of the UPA as eliminating the standing of a gestational
mother to file a proceeding to adjudicate parentage as to a child born to her
under a valid gestational agreement, this does not appear to support a similar
reading of section 702 of the UPA. 
Though it might be an example of a limitation on standing that is not
contained in section 602 of the UPA itself, article 8 differs significantly
from article 7 of the UPA.  Article 8
provides procedures independent from a parentage proceeding for intended
parents to validate a gestational agreement and be declared parents of the
child.  See UPA (2000), article
8.  Article 7 does not provide
independent procedures, and, in fact, section 705 of the UPA indicates that a
proceeding to adjudicate parentage is the way to resolve controversies over
parentage in the assisted-reproduction context. 
See UPA (2000), section 705.





[6]  There is no indication that the
2002 comments were substantive, and these comments may be referring to Astanding@ in a looser sense, like that used
in the comment to section 602, to refer to the ability to succeed on the
merits, which is actually not standing at
all.  See UPA (2002), sections
602, 702, cmts.





[7]  On rehearing,
both Sullivan and Russell have submitted filings in which they attribute to
this court various holdings and rulings that far exceed the scope of our
opinion.  To eliminate the parties= apparent confusion about the nature and scope of this
court=s decision in this case, we note the following:

 

$                   
This court has
taken no position on the validity or enforceability, if any, of the ACo-Parenting Agreement@ signed
by Sullivan and Russell.

$                   
This court has
not based its determination that Russell has standing on the ACo-Parenting Agreement.@

$                   
This court has
not held that the trial court should determine the effect, if any, of the ACo-Parenting Agreement@ by
means of an exercise of the trial court=s
discretion.

$                   
This court has
not indicated that the merits of cases such as this one should be decided by
the trier of fact on a case-by-case basis.